**UNITED STATES of America,**
Plaintiff–Appellee,

v.

**Trudie P. WESTMORELAND,**
Defendant–Appellant.

No. 87–4515.

United States Court of Appeals,
Fifth Circuit.

March 23, 1988.

Alvin M. Binder, Lisa B. Milner, Jackson, Miss., for defendant-appellant.

Ruth R. Harris, Asst. U.S. Atty., Jackson, Miss., for plaintiff-appellee.

Before RUBIN, KING and WILLIAMS, Circuit Judges.

KING, Circuit Judge:

A county supervisor appeals her convictions for bribery, extortion, and mail fraud because she took kickbacks in purchases of county materials. She asserts that a federal statute prohibiting theft or bribery concerning federally funded programs does not apply to cases involving only state funds, that the district court wrongly admitted unduly prejudicial evidence, that the government's proof of her criminal predisposition failed to overcome her entrapment defense, and that there was insufficient evidence of extortion and mail fraud. We conclude that none of these arguments warrants reversal of the convictions.

## I.

Trudie P. Westmoreland ("Westmoreland") became a county supervisor in Perry County, Mississippi, on November 20, 1985. As a county supervisor, Westmoreland had

authority to purchase materials for the county in order to maintain its roads and bridges in her district. On February 5, 1986, an undercover agent of the Federal Bureau of Investigation, Jerry King ("Agent King"), approached Westmoreland posing as a salesman for Mid–State Pipe and Supply Company. At their first meeting, Westmoreland ordered materials from Agent King and accepted $760 in cash from him. Agent King tape recorded the transaction and further transactions in which Westmoreland approved fraudulent invoices in exchange for cash kickbacks. Shortly after Westmoreland's initial contact with Agent King, she also accepted kickbacks from Ray Davis, a local chemical salesman, in connection with purchases of supplies for the county. The vendors' invoices and the county's checks for payment were exchanged by mail. Westmoreland received a total of $1702 from Agent King, which she admitted but claimed was a result of entrapment, and $500 from Ray Davis, which she denied.

On March 7, 1987, a grand jury issued a six count indictment against Westmoreland charging her with bribery, 18 U.S.C. § 666(b); mail fraud, 18 U.S.C. § 1341; extortion, 18 U.S.C. § 1951(a); and aiding and abetting an offense against the United States, 18 U.S.C. § 2. During a jury trial, the government introduced testimony by Agent King and Ray Davis, the tape recordings and transcripts of their contents, and copies of the documents involved in the sales transactions. In addition to eliciting testimony concerning Westmoreland's misconduct, the prosecutor questioned witnesses about another county supervisor and a friend of Westmoreland's, Junie Mixon, who was also indicted for taking kickbacks. In rebuttal to Westmoreland's entrapment defense, the prosecutor also offered the testimony of a state auditor concerning an investigation of Westmoreland's financial records from her prior term as a justice court judge that indicated a discrepancy of county funds. The jury returned guilty verdicts on all counts of the indictment, and after the district court denied Westmoreland's motion for a judgment of ac-quittal or, alternatively, a new trial, she timely appealed.

On appeal, Westmoreland raises six points of error. First, she contends that the district court lacked jurisdiction over the bribery charge because, in her view, the relevant federal statute (section 666) reaches only significant acts of bribery involving federal funds and the government did not allege or prove that the bribery scheme used federal monies. Second, she asserts that the district court should have excluded the rebuttal testimony concerning another instance where she allegedly misappropriated county funds because the prejudicial effect outweighed any probative value. Third, Westmoreland argues that her convictions resulted from "guilt by association" because the jury heard evidence about her relationship with another county supervisor and his alleged misconduct. Fourth, she contends that the government failed to prove predisposition beyond a reasonable doubt and thus her entrapment defense entitled her to acquittals of the crimes that involved Agent King. Finally, in her fifth and sixth arguments, Westmoreland contends that the evidence was insufficient to sustain her convictions for extortion and mail fraud. We view these arguments as raising three types of issues —statutory interpretation, admissibility of evidence, and sufficiency of proof—and we address them accordingly below.

## II.

### A. The Scope of Section 666

Section 666 of Title 18, United States Code, prohibits theft or bribery concerning programs receiving federal funds. As originally enacted, subsection (b) provides:

> Whoever, being an agent of an organization, or of a State or local government agency, described in subsection (a), solicits, demands, accepts, or agrees to accept anything of value from a person or organization other than his employer or principal for or because of the recipient's conduct in any transaction or matter or a series of transactions or matters involving $5,000 or more concerning the

affairs of such organization or State or local government agency, shall be imprisoned for not more than ten years or fined not more than $100,000 or an amount equal to twice that which was obtained, demanded, solicited or agreed upon in violation of this subsection, whichever is greater, or both so imprisoned and fined. 18 U.S.C. § 666(b) (Supp.1984). Subsection (a) of the original statute describes an organization or a state or local government agency "that receives benefits in excess of $10,000 in any one year period pursuant to a Federal program involving a grant, a contract, a subsidy, a loan, a guarantee, insurance, or another form of Federal assistance." 18 U.S.C. § 666(a) (Supp.1984).

The indictment against Westmoreland follows the statutory language and alleges that she acted as an agent of Perry County, a local government agency that received benefits in excess of $10,000 in a one year period under a federal program providing federal assistance to the county, and that she knowingly and willfully accepted cash in the sum of $2,202 from persons other than her employer because of her conduct in transactions or a series of transactions involving $5,000 or more concerning the affairs of the county. The government's evidence at trial indicates that, during a one year period while Westmoreland served as a county supervisor and allegedly committed the illegal acts, Perry County received federal revenue sharing funds totaling $222,949 and allocated $36,391.55 of those funds to her district. Evidence of the sales transactions associated with the alleged bribes shows that Westmoreland authorized, and the county paid, a total of $14,482.92 for the purchased goods.

Westmoreland contends, however, that the government's allegations and subsequent proof were insufficient to satisfy the jurisdictional amounts contained in the statute. Specifically, she argues that the statute requires the involvement of $5,000 of federal, not merely general, funds in the allegedly corrupt transactions. In urging this interpretation, Westmoreland quotes legislative history which states that the statute was "designed to create new offenses to augment the ability of the United States to vindicate significant acts of theft, fraud, and bribery involving Federal monies that are disbursed to private organizations or State and local governments pursuant to a Federal program." S.Rep. No. 225, 98th Cong., 2d Sess. 369, *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3510. From this statement, Westmoreland concludes that Congress intended to reach bribery schemes involving federal rather than state funds, and she argues that, because the federal revenue sharing funds received by Perry County were segregated and not expended for the types of purchases she made, the alleged acts of bribery concerned only state monies and did not fall within the purview of the statute.[1] In Westmoreland's view, sufficient statutory ambiguity exists to invoke the rule of strict construction applicable to criminal statutes and the rule that congressional intent, as evidenced by the legislative history, controls.[2] Under her interpretation, derived from these principles and applied to the facts of this case, the government must show that the allegedly corrupt sales trans-

---

[1] In this regard, Westmoreland also suggests in her reply brief that, because the county's method of purchasing materials for road maintenance does not use federal revenue sharing funds, this particular county program does not receive federal funds. She argues that the county's receipt of general assistance funds for other uses should not confer federal jurisdiction over state crimes. To the extent that Westmoreland's argument introduces the concept of a local government program (as opposed to a local government agency) that the statute does not contain, we see no need to address it.

[2] Westmoreland asserts that section 666 is ambiguous in the following respects: whether sub-section (b), like subsection (a), requires a taking of $5,000 and thus means that the bribes, rather than the related transactions, must equal the $5,000 amount; whether small transactions added together may satisfy the amount; and whether the amount must consist of some federal funds. She does not explain what creates the first two ambiguities, nor does she urge us to adopt an interpretation concerning them. Thus we do not pursue them in our analysis. Concerning the third alleged ambiguity, we assume that it underlies her main argument—that federal funds must be traced to the allegedly corrupt transactions.

actions involved $5,000 of the county's federal revenue sharing funds, not merely $5,000 of any funds.

The district court rejected Westmoreland's statutory interpretation, and although the district court's decision of law is freely reviewable, we do likewise. The issue presented by Westmoreland's argument is whether section 666(b) requires the government to trace federal funds to the tainted transactions of a local government agency covered by the statute. Despite Westmoreland's protestations, we find the relevant statutory language plain and unambiguous. By the terms of section 666, when a local government agency receives an annual benefit of more than $10,000 under a federal assistance program, its agents are governed by the statute, and an agent violates subsection (b) when he engages in the prohibited conduct "in *any* transaction or matter or series of transactions or matters involving $5,000 or more concerning the affairs of" the local government agency. 18 U.S.C. § 666(b) (Supp. 1984) (emphasis added). Subsection (b) contains nothing to indicate that "any transaction involving $5,000" means "any federally funded transaction involving $5,000" or "any transaction involving $5,000 of federal funds," and other subsections of the statute contain no inconsistent provisions that might suggest such a qualification.

Lower courts have similarly found section 666 to be unambiguous in its application. *See United States v. Smith*, 659 F.Supp. 833, 834–35 (S.D.Miss.1987) ("The language in Section 666 is clear that it is not an essential element of this crime [bribery] that the government trace the $5,000 to specific federal government funds."); *see also United States v. Sadlier*, 649 F.Supp. 1560, 1564 (D.Mass.1986). Although Westmoreland cites one case where a district court found section 666(b) unclear, the issue presented was the requisite element of intent, and we view any ambiguity in that regard as irrelevant to our decision. *See United States v. Jackowe*, 651 F.Supp. 1035, 1036 (S.D.N.Y.1987). Similarly, the Tenth Circuit applied the rule of strict construction in *United States v.*

*Barquin*, 799 F.2d 619 (10th Cir.1986), because it concluded that an Indian tribe or its business council did not fit within the plain meaning of the term "local government agency" as defined by section 666, a definition unrelated to the issue before us.

"Courts in applying criminal laws generally must follow the plain and unambiguous meaning of the statutory language. '[O]nly the most extraordinary showing of contrary intentions' in the legislative history will justify departure from that language." *United States v. Albertini*, 472 U.S. 675, 680, 105 S.Ct. 2897, 2902, 86 L.Ed. 2d 536 (1985) (citations omitted) (quoting *Garcia v. United States*, 469 U.S. 70, 75, 105 S.Ct. 479, 482, 83 L.Ed.2d 472 (1984)). Thus we turn to the legislative history "as an additional tool of analysis" with the recognition that our inquiry will result in "a limitation on the 'plain meaning' of the statutory language" only under exceptional circumstances. *Garcia*, 469 U.S. at 75, 105 S.Ct. at 482. Examining the Senate Report on which Westmoreland relies, we conclude that the legislative history supports our interpretation of section 666 rather than negates it.

Senate Report 225 explains the Comprehensive Crime Control Act of 1984, which created section 666. The Report indicates that one of the purposes for enacting the new provisions in section 666 was to fill a gap caused by the difficulty of tracing federal monies. To explain the need for augmenting an existing section that punishes theft or embezzlement by officers and employees of agencies funded by a particular federal program, the Report states:

> [T]here is no statute of general applicability in this area, and thefts from other organizations or governments receiving Federal financial assistance can be prosecuted under the general theft of Federal property statute, 18 U.S.C. § 641, only if it can be shown that the property stolen is property of the United States. In many cases, such prosecution is impossible because title has passed to the recipient before the property is stolen, or the funds are so commingled that the Federal character of the funds cannot be

shown. This situation gives rise to a serious gap in the law, since even though title to the monies may have passed, the Federal Government clearly retains a strong interest in assuring the integrity of such program funds. Indeed, a recurring problem in this area (as well as in the related area of bribery of the administrators of such funds) has been that State and local prosecutors are often unwilling to commit their limited resources to pursue such thefts, deeming the United States the principal party aggrieved.

With respect to bribery, 18 U.S.C. 201 generally punishes corrupt payments to Federal public officials, but there is some doubt as to whether or under what circumstances persons not employed by the Federal Government may be considered as a "public official" under the definition in 18 U.S.C. § 201(a)....

S.Rep. No. 225, 98th Cong., 2d Sess. 369, *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3510. In its continued discussion of the inadequacies of the general bribery statute, the Report notes that the courts of appeals had reached different results in deciding whether a person employed by a private organization receiving federal monies was a "public official." *See* S.Rep. No. 225 at 369–70; 1984 U.S.Code Cong. & Admin.News at 3510–11 (comparing *United States v. Hinton,* 683 F.2d 195 (7th Cir.1982) and *United States v. Mosley,* 659 F.2d 812 (7th Cir.1981) with *United States v. Loschiavo,* 531 F.2d 659 (2d Cir. 1976) and *United States v. DelToro,* 513 F.2d 656 (2d Cir.1975)). A review of the cited cases reveals that resolution of the question sometimes depended on the extent to which the person exerted federal authority and controlled the dispersal of federal funds. *See Hinton,* 683 F.2d at 198–200; *Mosley,* 659 F.2d at 815–16. Furthermore, the Report specifically states its intent "to reach thefts and bribery in situations of the types involved in *DelToro*" and other cases. S.Rep. No. 225 at 370; 1984 U.S. Code Cong. & Admin.News at 3511. In *DelToro,* an official of a federally funded program demanded a bribe to use his position to secure a lease of office space for the program from one of the defendants. At the time that the defendant partially paid the bribe, no commitment of federal funds for the new lease existed, although a subsequent funding request would have been made through a federal program. 513 F.2d at 662. Arguably however, Congress did not intend the involvement of federal funds in a corrupt transaction to be a factual certainty.

In short, while the legislative history manifests a congressional intent to preserve the integrity of federal funds, Congress specifically chose to do so by enacting a criminal statute that would eliminate the need to trace the flow of federal monies and that would avoid inconsistencies caused by the different ways that various federal programs disburse funds and control their administration. Westmoreland's interpretation, however, would produce both of those problems. Furthermore, the amended version of section 666 reinforces our interpretation. Although the amendment occurred after Westmoreland's alleged misconduct and did not affect her, its legislative history indicates that the relevant changes were "technical" ones. *See* H.R.Rep. No. 797, 99th Cong., 2d Sess. 30, *reprinted in* 1986 U.S.Code Cong. & Admin.News 6138, 6153. The pertinent part of section 666 now provides that an agent of a local government agency (that receives federal assistance as previously described) who "accepts or agrees to accept anything of value from any person, intending to be influenced or rewarded in connection with *any* business, transaction, or series of transactions of such ... agency involving *anything* of value of $5,000 or more" shall be fined, imprisoned, or both. 18 U.S.C. § 666(a)(1)(B) (Supp.1986) (emphasis added). As in the original statute, any reference to federal funds is conspicuously absent from the operative provisions, and it is clear that Congress has cast a broad net to encompass local officials who may administer federal funds, regardless of whether they actually do.

In opposing an expansive interpretation, Westmoreland argues that the result extends federal power in a manner that, in many instances, the federal interest at

stake does not warrant. Once Congress has spoken, however, we do not sit to judge the wisdom of its action. It is sufficient that Congress seeks to preserve the integrity of federal funds by assuring the integrity of the organizations or agencies that receive them. Moreover, the statute does not encompass every local bribery as Westmoreland suggests. Although the extent of the federal government's assistance programs will bring many organizations and agencies within the statute's scope, the statute limits its reach to entities that receive a substantial amount of federal funds and to agents who have the authority to effect significant transactions. In conclusion, then, the direct involvement of federal funds in a transaction is not an essential element of bribery under section 666(b); the government need not prove that federal monies funded a corrupt transaction.

### B. The Admissibility of Prejudicial Evidence

Westmoreland contends that the district court erred in admitting two types of evidence: (1) evidence of her alleged misconduct during a previous term of public office and (2) the "guilt by association" evidence concerning another county supervisor, Junie Mixon. The first, she argues, was inadmissible under Rule 404(b) of the Federal Rules of Evidence. Concerning the second, she argues that some of it was hearsay, some was irrelevant, and all was highly prejudicial. Where a party timely objects to the admission of evidence, we review the district court's ruling under an abuse of discretion standard. *See, e.g., United States v. Henthorn,* 815 F.2d 304, 308 (5th Cir.1987); *Petty v. Ideco, Div. of Dresser Indus., Inc.,* 761 F.2d 1146, 1151 (5th Cir. 1985).

### 1. The Extrinsic Offense Evidence

■ In *United States v. Beechum,* we outlined a two-step analysis to guide trial courts in determining the admissibility of evidence under Rule 404(b): "First, it must be determined that the extrinsic offense is relevant to an issue other than the defendant's character. Second, the evidence must possess probative value that is not substan-

tially outweighed by its undue prejudice and must meet the other requirements of Rule 403." 582 F.2d 898, 911 (5th Cir.1978) (en banc). We further held, in *United States v. Robinson,* 700 F.2d 205, 213 (5th Cir.1983), that the district court must articulate its balancing judgment on the record when requested by a party. In this case, the government proffered the testimony of a state investigative auditor concerning discrepancies in Westmoreland's financial records from her prior term as justice court judge, and the district court thoroughly complied with the guidelines of *Beechum* and *Robinson.* The district judge's determination reflects a well-reasoned assessment of the factors of probativeness and prejudice underlying his decision, and we perceive no abuse of his discretion in admitting the evidence.

Although Westmoreland obviously disagrees with the district court's judgment, her primary complaint is that, because the investigation was incomplete, she was unable to explain the discrepancies or to answer any charges. Westmoreland urges us to follow the Tenth Circuit's decision in *United States v. Biswell,* 700 F.2d 1310, 1318 (10th Cir.1983), where the court held that, under the circumstances, evidence of "ongoing investigations" should have been excluded. Without expressing an opinion about *Biswell,* we reject Westmoreland's assertion that evidence of the uncompleted investigation here lacked probative value and overwhelmingly prejudiced her because she could not adequately respond. The evidence did not portray her as "taking part in general criminal activities for an undefined period." *Biswell,* 700 F.2d at 1316. Rather, the auditor's testimony was detailed and specific, and Westmoreland knew of the charges against her. A state auditor requested Westmoreland's financial records for the years in question when the investigation began; the government informed Westmoreland before trial that it might use the evidence; and she received copies of the auditor's worksheets at the start of the trial.

Moreover, Westmoreland's argument concerning probativeness actually chal-

lenges the reliability of the auditor's figures. Clearly, if the calculations were so erroneous that no discrepancy in fact existed, then the government failed to sufficiently prove that Westmoreland committed the alleged extrinsic offense—abuse of an elected office by misappropriating public funds—and the evidence would be irrelevant to show intent and predisposition, the purposes for which it was admitted. *See Beechum,* 582 F.2d at 912–13. However, "[t]he standard for the admissibility of extrinsic offense evidence is that of rule 104(b): 'the preliminary fact can be decided by the judge against the proponent only where the jury could not reasonably find the preliminary fact to exist.'" *Id.* at 913 (quoting 21 Wright & Graham, *Federal Practice and Procedure: Evidence* § 5054, at 269 (1977)). In this case, the auditor admitted on cross-examination that Westmoreland might be able to resolve some of the discrepancy, but the auditor also testified that further investigation would probably increase the $9,506.95 figure derived from the completed portions of the audit. Thus the existence of a discrepancy cannot seriously be questioned, and as stated earlier, we conclude that the district court did not abuse its discretion by admitting the auditor's testimony.

### 2. The Evidence Concerning Junie Mixon

■ The district court admitted, over Westmoreland's objection, testimony by Agent King that a conversation with Junie Mixon led him to investigate Westmoreland because it indicated that she might be willing to accept kickbacks. Ray Davis and Agent King also testified, over objection, that they paid kickbacks to Junie Mixon. Ray Davis made this statement while explaining why he believed that Westmoreland would accept illegal payments and how he indirectly offered kickbacks to her by simply referring to his dealings with Junie Mixon; Agent King's statement occurred in the course of testifying how he initiated his investigation. Westmoreland also complains of the government's cross-examination of one of her character witnesses, a contractor who the government questioned about paving a road to Mixon's house; the government contends that it properly sought to impeach the witness by asking about a specific instance of misconduct. Westmoreland contends that evidence of Mixon's statements was hearsay and that evidence concerning Mixon's misconduct was irrelevant. She argues that the evidence was prejudicial because she was thus associated with Junie Mixon and his crimes. Westmoreland cites numerous cases where we have held that the admission of evidence concerning the crimes of a defendant's friends or relatives constituted reversible error because it resulted in "guilt by association." *See, e.g., United States v. Romo,* 669 F.2d 285 (5th Cir. 1982); *United States v. Escamilla,* 666 F.2d 126 (5th Cir.1982); *United States v. Ochoa,* 609 F.2d 198 (5th Cir.1980); *United States v. Labarbera,* 581 F.2d 107 (5th Cir.1978).

Although the "guilt by association" problem presented by this evidence causes us some concern, we cannot accept Westmoreland's contention that admission of the evidence, even if erroneous, constituted reversible error. First, we cannot say that the evidence concerning Junie Mixon "was irrelevant to any issue in the case." *Labarbera,* 581 F.2d at 109. The government offered the evidence to establish that Mixon and Westmoreland had talked about taking kickbacks, evidence that was clearly relevant to whether she was predisposed to commit the crimes or had been entrapped by the government as she claimed, and to counter her position that, as a new supervisor, she innocently dealt with corrupt vendors without realizing that they were offering her illegal payments. Second, "[t]he determination of the impact which a prejudicial statement has upon a jury must be made on a case by case basis." *Escamilla,* 666 F.2d at 128. After carefully reviewing the record in this case, we are unconvinced that the evidence objected to here had a prejudicial impact. References to Junie Mixon do not permeate the record; rather, the government questioned witnesses concerning him on only three occasions during five days of trial. Moreover, the trial

judge instructed the jury to return a verdict on the offenses alleged in the indictment and to not consider the guilt or innocence of any person other than Westmoreland.

Most importantly, "[a] court's assessment of the impact of a prejudicial statement is tempered by the substantiality of evidence of the defendant's guilt." *Id.* at 129. Westmoreland admitted receiving payments for county purchases from Agent King and, on one occasion, an unexplained envelope of cash from Ray Davis. Thus the issues at trial concerned her intent and lack of predisposition, and on these issues, the evidence was overwhelming. The tape recordings of Westmoreland accepting bribes show her discussing the kickback scheme with Agent King at length, including "busting" invoices or billing the county for undelivered goods and "splitting" invoices to avoid the state's bid advertising laws, and laughingly accepting Agent King's money during their first meeting. Westmoreland explained that she unwittingly acquiesced in a plan orchestrated by Agent King because, as a new supervisor, she did not want to reveal her ignorance; however, at later meetings where she also accepted money, she told Agent King how her recordkeeping system would prevent the state auditor from detecting their dealings—a statement that clearly belies her professed innocence. In addition to Westmoreland's willingness to accept illegal payments from Agent King, the evidence of her predisposition, as discussed below, was substantial. Even without considering evidence that she discussed taking kickbacks before the government became involved, surely the properly admitted evidence that she had previously used her public office for personal gain and that she dealt illegally with a vendor who was not a government agent shows that the government detected, rather than caused, her corruption. In short, we conclude that the

jury convicted Westmoreland based on the overwhelming evidence of her guilt, not on any evidence of her friend's misconduct.

### C. The Sufficiency of the Evidence

Westmoreland contends that the government failed to sufficiently prove three things: (1) predisposition, (2) extortion, and (3) mail fraud. The first arises from Westmoreland's defense of entrapment; the second and third are the substantive offenses charged in counts two through six of the indictment.[3] The government's burden of proof on each is the same, and the standard for reviewing a jury's verdict concerning them is similar. Concerning entrapment, we recently stated: "The Government bears the burden of proving beyond a reasonable doubt that defendant was predisposed to commit the offense, but entrapment is established as a matter of law only when no reasonable jury could have believed that defendant was predisposed to commit the offense." *United States v. Rubio,* 834 F.2d 442, 450 (5th Cir.1987) (citations omitted). In reviewing the sufficiency of the evidence to support a conviction, "[t]he standard is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Hernandez-Palacios,* 838 F.2d 1346, 1348, (5th Cir.1988) (citing *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) and *United States v. Bell,* 678 F.2d 547, 549 (5th Cir.1982) (en banc), *aff'd,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983)). In performing each inquiry, we must view the evidence in the light most favorable to the government. *Hernandez-Palacios,* 838 F.2d at 1348; *Rubio,* 834 F.2d at 451.

#### 1. Predisposition

◾ Predisposition may be shown by the defendant's conduct—by eager, active par-

---

**3.** Westmoreland also suggests that the government's conduct during the undercover operation was so outrageous that it required dismissal of the indictment. However, she did not show government overinvolvement in the charged crimes or any conduct by Agent King constituting one of the "rarest and most outrageous

circumstances" that might warrant that result. *See United States v. Nations,* 764 F.2d 1073, 1076–77 (5th Cir.1985). Thus we view this argument as meritless and focus on her claim that the government insufficiently proved her predisposition.

ticipance, *United States v. Nations*, 764 F.2d 1073, 1077 (5th Cir.1985), or by similar conduct at other times, *United States v. Rodriguez*, 474 F.2d 587, 590 (5th Cir.1973) —and by other evidence of the defendant's subjective mental state, *Rubio*, 834 F.2d at 450. "In essence, the jury must find that the defendant's culpable intent originated with the defendant and was not the result of acts of government agents." *Nations*, 764 F.2d at 1077. In this case, we conclude that the evidence was sufficient for a reasonable jury to find that Westmoreland was predisposed to commit the alleged crimes. There was no evidence of serious resistance by Westmoreland to Agent King's invitation to participate in the kickback scheme, and the jury could have viewed the tape-recorded conversations as evidence of Westmoreland's eager and active participance. Moreover, the evidence that Westmoreland engaged in similar conduct in her dealings with Ray Davis and that she had previously used her position as a public officer to misappropriate funds showed that she independently possessed an intent to commit the crimes.

### 2. Extortion

■ Westmoreland was charged with extortion "under color of official right" in violation of 18 U.S.C. § 1951, commonly known as the Hobbs Act. "A conviction under the Hobbs Act may be sustained by a finding that a public official has taken a fee, unlawfully, under color of his public office, in return for performance or nonperformance of an official act." *United States v. Wright*, 797 F.2d 245, 250 (5th Cir.1986). Westmoreland contends that her conduct, mere passive acceptance of a gratuity, did not constitute evidence that she conditioned the performance of an official duty on the payment of a fee and that there was no other evidence to support that conclusion. However, we have stated that "[t]here is no requirement that threat, force, or duress be proved when the defendant is a public officer," *id.*, and under the Hobbs Act, an official may not "accept money in return for requested exercises of his official power," *United States v. Dozier*, 672 F.2d 531, 539 (5th Cir.1982). Thus while it is true that no witness testified that Westmoreland demanded kickbacks, the evidence that she accepted illegal payments in exchange for authorizing purchases of materials for the county was sufficient for a rational trier of fact to find that she committed extortion.

### 3. Mail Fraud

■ Mail fraud requires proof of three elements: "(1) the defendant's participation in some scheme or artifice to defraud; (2) the use of the mails 'caused by' defendant or someone associated with the scheme; and (3) the use of the mails for the purpose of executing the scheme." *United States v. Davis*, 752 F.2d 963, 970 (5th Cir.1985) (citations omitted). Westmoreland contends that she participated in a scheme to defraud using the mails that was devised by Agent King and that she neither knew of the scheme nor intended to participate in it. "Of course, the government must prove specific intent to defraud to establish the crime of mail fraud; however, this intent can be proven by the scheme to defraud and may be inferred from other facts." *United States v. McDonald*, 837 F.2d 1287, 1293 (5th Cir.1988) (citations omitted). In this case, the tape recordings of Westmoreland's conversations with Agent King indicate that they discussed the details of the scheme on several occasions, and we conclude that a rational trier of fact could have found that she both knew of the scheme to defraud and that she intentionally participated in it.

### III.

For the above reasons, Westmoreland's convictions are AFFIRMED.