# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

May 13, 2008

Charles R. Fulbruge III
Clerk

No. 07-10210

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

BARBARA HILDENBRAND

Defendant-Appellant

consolidated with
No. 07-10211

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

GERALD STONE

Defendant-Appellant

Appeal from the United States United States District Court
for the Northern District of Texas, Dallas Division

Before DAVIS and SOUTHWICK, Circuit Judges, and DRELL, District Judge:[*]

W. EUGENE DAVIS:

Defendants Barbara Hildenbrand and Gerald Stone appeal their guilty plea convictions for defrauding the Department of Housing and Urban Development, conspiring to steal from an organization receiving federal funds, and tax evasion primarily on the basis that the factual resumes submitted in

_____

[*] District Judge for the Western District of Louisiana, sitting by designation.

support of their guilty pleas are insufficient to support their convictions of these crimes. We disagree and affirm appellants' convictions. Because of our disposition of this threshold issue and the appeal waiver in their plea agreements, we do not reach any other issues raised by the defendants and dismiss the appeals of their sentences.

I.

Barbara Hildenbrand conducted business in the name of Community Housing Fund (CHF), a § 501(c)(3) nonprofit organization out of Irving, Texas. CHF was formed for the purpose of providing affordable housing to low-income persons. Hildenbrand was the president of CHF and responsible for all operations. CHF was selected to participate in HUD's Single Family Affordable Housing Program (SFAHP or "the program"), which was designed to help persons with low-to-moderate incomes purchase affordable homes. Under the SFAHP, HUD offered certain of its properties to nonprofit companies for purchase at discounted prices, usually 10% to 30% below the fair market value.

Through CHF, Hildenbrand purchased discounted homes from HUD under the program. She then engaged contractors to rehabilitate the houses for sale. Hildenbrand used several contractors to perform the rehabilitation work on the houses CHF purchased, but Gerald Stone, who later became her husband and who conducted business under the name of Ranscott Construction, Inc. (RCI), performed the vast majority of the repair and warranty work on the program houses.

HUD created the SFAHP to sell properties at a discount to nonprofits, who would then pass on the discount received from HUD to increase home ownership opportunities for low- and moderate-income families and individuals. The agency has rules about the price nonprofits could realize from the property - for example, limiting the sales price of properties sold at a 30% discount to a maximum of 110% of the net development cost of the property. Rehabilitation

expenses are an allowable cost in calculating net development cost. Thus if Hildenbrand's and Stone's scheme fraudulently increased the development cost of a property, it would in turn increase the property's allowable sales price thus thwarting the goal of the program to pass the discount granted by HUD onto the ultimate home owner or renter.

In her factual resume, Hildenbrand made admissions regarding her purchase of two discounted houses from HUD under the SFAHP. On January 25, 1999, she purchased, through CHF, residential property at 5720 Forest Oaks, Dallas, at a 30% discount, worth $5,025. On December 6, 1999, she purchased a residence at 2449 Maverick, also in Dallas, for which she received a 30% discount, worth $15,900. Hildenbrand stipulated that she received the discounts for the purchase of these two homes from HUD with the intent to defraud HUD and unlawfully to defeat its purposes. Hildenbrand used Stone, through RCI, to perform the repair work on the program homes. Hildenbrand admitted that, by using CHF money, she and Stone defrauded HUD and defeated the purposes of the SFAHP by increasing the costs associated with the particular houses through improper payments to RCI. This in turn increased the ultimate prices of the residences, making them less affordable to the low income purchasers of the homes, the intended beneficiaries of the program.

Specifically, Hildenbrand and Stone engaged in a conspiracy to steal funds from CHF by writing checks to RCI and by falsely documenting the stolen money as being related to repair costs payable to RCI. Hildenbrand admitted issuing a CHF check on January 20, 2000, for $24,000, payable to cash, used to purchase a Florida cashier's check in the same amount payable to a realty escrow account for the purchase of a condominium in Stone's name. She further admitted issuing a CHF check on January 28, 2000, for $222,927.73, payable to cash, which was used to purchase another cashier's check, which was in turn used to purchase the condominium in Stone's name. On the same date, Stone used the

3

$246,927.73 in CHF funds to purchase a condominium in North Palm Beach, Florida.

On or about May 8, 2000, Hildenbrand issued a CHF check for $246,500, payable to RCI, which Stone endorsed back to CHF to document the CHF funds he had already received for the January 2000 condominium purchase. On the same date, Hildenbrand, aided by CHF's bookkeeper, falsely documented in CHF records that $30,000 of the payments related to the January 2000 condominium purchase were for work performed by Stone in relation to the addresses at 5720 Forest Oaks and at 2449 Maverick. However, CHF's books reflected that final payment had been made to RCI for work done on both properties. For example, CHF acquired the house on Maverick on December 10, 1999; it paid RCI $500 on that date and an additional $5,500 on January 7, 2000, for rehabilitation work. The January 7, 2000, payment was marked "final," by the RCI invoice and CHF records. However, on May 8, 2000, CHF paid RCI an additional $20,000 for supposed rehabilitation work on the Maverick residence. The funds for that additional payment were lumped with a number of other payments used to document funds previously paid to RCI through the CHF checks issued on January 20 and 28, 2000 for the Palm Beach Condo. The invoices for work on the Forest Oaks residence had similarly been marked "final" on June 1, 1999, but on May 8, 2000, CHF paid RCI an additional $10,000 for supposed rehabilitation work on that address.

Investigation revealed that Hildenbrand, operating through CHF, purchased at least 23 houses in Texas and Florida during 1999 and 2000 from HUD under the SFAHP, receiving discounts totaling $152,906.80 as inducement to purchase the homes. CHF would secure interim financing for program houses without disclosing to the banks the discount it received from HUD; it would use those funds to pay RCI to rehabilitate the homes. In many instances, the actual cost to rehabilitate the houses was less than the amount paid to RCI.

Additionally, HUD requires that SFAHP participants use independent, unrelated contractors for work on program properties. In violation of this rule, Stone was intimately involved with Hildenbrand's business dealings, and was listed on bank documents as CHF's area manager and vice president, with cosignatory authority on CHF's bank account.

In his factual resume, Stone admitted that he and Hildenbrand willingly conspired to embezzle, convert, and misapply property in excess of $5,000 owned by an organization receiving federal assistance, in violation of 18 U.S.C. § 666. Specifically, Stone admitted that he and Hildenbrand stole and unlawfully converted money from CHF bank accounts for non-business-related purchases, then falsely claimed that portions of the payments were made for legitimate rehabilitation work performed by Stone through RCI. The factual resume listed 23 homes purchased by CHF from HUD under the SFAHP in Texas and Florida at discounts of 10% to 30% below the fair market value. Stone admitted that he coordinated the repair and warranty work on the Texas homes but that Hildenbrand hired a different contractor to do the work on the Florida residences.

For the Texas homes, Hildenbrand had the CHF bookkeeper make entries showing amounts paid to Stone were for rehabilitation of properties in Texas that had previously been marked as having received "final payment." For example, CHF purchased a residence at 1502 Bayshore in Garland, Texas, in March 1999; it paid RCI $10,000 on March 25, 1999, for rehabilitation work and paid $5,000 on June 7, 1999, which payment was marked "final" by RCI and CHF records. Over one year later, on July 6, 2000, CHF paid RCI an additional $165,400 for supposed rehabilitation work on the Bayshore house. The funds for this payment were lumped in with a number of other payments used to document funds previously paid to RCI through a CHF check on March 13, 2000, in the amount of $212,500.

Additionally, Hildenbrand had the CHF bookkeeper document falsely that several amounts paid to Stone on January 20 and 28, 2000, were related to rehabilitation of properties in St. Petersburg and Ft. Lauderdale, Florida, despite the fact that Stone did not perform any work on those Florida properties. Stone stipulated that the listed payments were not legitimate and constituted theft from CHF; he further conceded that, in 2000, he received $459,427.73, in unlawfully converted funds from CHF, which money he used to purchase the aforementioned condominium and a $212,500 yacht known as the "Shelby Jean."

Stone additionally admitted that the $459,427.73 qualified as taxable income for federal income tax purposes, which income he intentionally failed to report on his 2000 individual tax return, filed on July 27, 2001. Stone conceded that he willfully attempted to evade and defeat a large part of the income tax due to the U.S. for the calendar year 2000. As a result of his intentional failure to report his true income, Stone admitted that he failed to report and pay additional taxes in the amount of $179,479 to the U.S. for the 2000 tax year.

Hildenbrand and Stone were charged in a 36-count indictment with conspiracy to steal from an organization receiving federal assistance, in violation of 18 U.S.C. §§ 666 and 371 (count 1); defrauding HUD, in violation of 18 U.S.C. § 1012 (counts 2 through 24); theft from an organization, in violation of 18 U.S.C. § 666 (counts 25-27); money laundering, in violation of 18 U.S.C. § 1957 (counts 28-33); and, as to Stone, two counts of tax evasion, in violation of 26 U.S.C. § 7201 (counts 34-35).[1]

Hildenbrand pleaded guilty, pursuant to a written plea agreement, to counts 2 and 3 of the indictment, two counts of defrauding HUD. As part of her plea, Hildenbrand waived the right to appeal or collaterally challenge her conviction and sentence, except as to 1) a sentence exceeding the statutory

---

[1] Count 36 alleged forfeiture of assets.

maximum; 2) a sentence resulting from arithmetic error; 3) a challenge to the voluntariness of her plea or waiver; and 4) claims of ineffective assistance of counsel. The substance of the factual basis for her plea is set forth above. Following a Rule 11 hearing before a magistrate judge, the district court accepted Hildenbrand's plea as knowing, voluntary, and supported by a sufficient factual basis.

Stone similarly pleaded guilty, pursuant to a written plea agreement, to count 1, conspiracy to commit theft against an organization, and to count 35, tax evasion by knowingly filing a fraudulent tax return for the year 2000. Stone's written plea agreement also contained a waiver-of-appeal provision identical to the waiver provision in Hildenbrand's plea agreement. Following a Rule 11 hearing before a magistrate judge, Stone's plea was also accepted as knowing, voluntary, and supported by a sufficient factual basis.

The PSR determined Hildenbrand's guidelines range at 18 to 24 months of imprisonment, though the statutory maximum was 12 months. Stone's PSR determined his guidelines range at 24 to 30 months of imprisonment. Both PSRs recommended restitution to HUD, characterizing HUD as the victim of the offenses.

Hildenbrand and Stone both objected to the PSR, not on the ground that the offense-level calculations were incorrect, but on the ground that the facts as described in the offense conduct showed that no crime was in fact committed. They further objected to the recommended restitution. Hildenbrand separately filed a motion to dismiss due to the insufficiency of the factual basis for her plea, which motion was denied. The probation officer recommended that the objections be overruled, determining that the defendants' allegations were refuted by their factual resumes, and that, inasmuch as they sought to withdraw their guilty pleas, the three-level acceptance-of-responsibility reductions should be rescinded.

The defendants were jointly sentenced. The district court overruled both defendants' objections to the PSR, specifically determining that Hildenbrand's plea was supported by admissions of fact that satisfied each element of the charged offenses and that Stone's factual resume similarly satisfied each element of the charged offenses. The district court declined to award either defendant credit for acceptance of responsibility; in Stone's case, the resulting guidelines range was 27 to 33 months. The district court sentenced Stone below the guidelines range, to 24 months on each count, to run concurrently, and ordered him to pay restitution in the amount of $263,516 to the IRS and $672,221 to HUD, owed jointly and severally with Hildenbrand. It sentenced Hildenbrand to the statutory maximum of 12 months on each count, to be served consecutively, for a total of 24 months, and ordered her to pay $672,221, jointly and severally with Stone, in restitution to HUD. The defendants timely appealed.

## II.

The defendants renew their arguments that there is an insufficient factual basis for their pleas. The Government counters that their arguments are barred by the waiver of appeal provisions in their written plea agreements. Neither defendant argues that their plea, or the waiver provision, was unknowing or involuntary. Instead, they argue that the waiver does not bar review of their claims that the factual basis is insufficient to support their pleas. This court reviews de novo whether a waiver of appeal bars an appeal. United States v. Baymon, 312 F.3d 725, 727 (5th Cir. 2002).

Even valid waivers do not bar a claim that the factual basis is insufficient to support the plea. See Baymon, 312 F.3d at 727 ("[E]ven if there is an unconditional plea of guilty or a waiver of appeal provision in a plea agreement, this Court has the power to review if the factual basis for the plea fails to establish an element of the offense which the defendant pled guilty to."); United

States v. Jacquez-Beltran, 326 F.3d 661 (5th Cir. 2003)(Waiver enforced because the allegation of the indictment and the stipulations supporting the plea satisfy the essential elements of the offense); cf. United States v. Inguanzo, 166 Fed. Appx. 110, 111 (5th Cir. 2006) ("Whether a defendant can waive his right to appeal on the ground that there was an insufficient factual basis to support his guilty plea is an open question in this circuit.").  The purpose of the rule is to protect a defendant who may plead guilty with an understanding of the nature of the charge, but without realizing that his conduct does not actually fall within the definition of the charged crime.  Baymon, 312 F.3d at 727.  Accordingly, this court must review the merits of the claims that the factual basis is insufficient to support the defendants' pleas.

On each count, if the factual basis is found to be sufficient to support the plea, then the plea agreement can be upheld and the waiver of appeal provision would bar any additional arguments raised on appeal.  See Baymon, 312 F.3d at 729 (concluding, after addressing the sufficiency of the factual basis for the plea and finding it adequate, that the waiver-of-appeal provision barred consideration of the defendant's remaining sentencing arguments).  If the factual basis is not sufficient as to any count, the conviction should be vacated, and the case remanded for further proceedings without consideration of any additional issues raised.  See United States v. Carter, 117 F.3d 262, 265 (5th Cir. 1997)(Conviction reversed, sentence vacated and case remanded for further proceedings.)

III.

We turn then to whether each defendant's factual basis is sufficient to support his or her respective guilty pleas.  A district court cannot enter a judgment of conviction based on a guilty plea unless it is satisfied that there is a factual basis for the plea.  FED. R. CRIM. P. 11(b)(3).  The district court must compare "(1) the conduct to which the defendant admits with (2) the elements

9

of the offense charged in the indictment or information." United States v. Marek, 238 F.3d 310, 315 (5th Cir. 2001) (en banc).

As both defendants objected on this basis in the district court, this court regards the district court's acceptance of a guilty plea as a factual finding to be reviewed for clear error. United States v. Adams, 981 F.3d 505, 509 (5th Cir. 1992). "A factual finding is not clearly erroneous as long as it is plausible in light of the record as a whole." United States v. Gonzales, 436 F.3d 560, 584 (5th Cir.2006) (internal quotation omitted).

When determining whether there is a factual basis for a guilty plea, inferences may be "fairly drawn" from the evidence adduced after the acceptance of a guilty plea but before or at sentencing. United States v. Dyer, 136 F.3d 417, 425 n.13 (5th Cir. 1998). "If sufficiently specific, an indictment or information can be used as the sole source of the factual basis for a guilty plea." Adams, 961 F.2d at 509; United States v. Bachynsky, 949 F.2d 722, 730 (5th Cir. 1991) (record read in pari materia with indictment established that a factual basis existed); cf. United States v. Boatright, 588 F.2d 471, 475-76 (5th Cir. 1979) (indictment not adequate when defendant was charged with conspiracy and indictment failed to allege facts tying defendant to the same). The PSR may also be considered in determining whether there was a sufficient factual basis to support a defendant's guilty plea so long as the court indicates on the record that it relies on the PSR. See Adams, 961 F.2d at 509, n. 3.

a. Hildenbrand's guilty plea for defrauding HUD under § 1012

Hildenbrand argues that the facts as pleaded do not establish that she committed the offense of defrauding HUD. Section 1012 provides, in pertinent part, that "[w]hoever receives any compensation, rebate, or reward, with intent to defraud [HUD] or with intent unlawfully to defeat its purposes . . . shall be fined under this title or imprisoned no more than one year, or both." 18 U.S.C. § 1012. Hildenbrand argues that her factual basis does not support a conviction

under this section for the following reasons: 1) CHF committed the offense, not her personally; 2) the discounted home prices CHF received from HUD through the SFAHP do not qualify as "compensation, rebate, or reward;" and 3) there is no evidence that she intended to defraud HUD.

Hildenbrand's contentions that there is no evidence to show that she, rather than CHF, committed the offense or to show that she intended to defraud are defeated by the specific admissions in her factual resume. She stipulated both that she was the president of and decision maker for CHF and that her intent was to defraud HUD and to unlawfully defeat its purposes under the SFAHP. The Factual Resume states "Hildenbrand conducted business in the name of Community Housing Fund (CHF)", "Hildenbrand, by and through the nonprofit organization CHF, received money and benefits" and "Hildenbrand agrees and stipulates that she received the above discounts from HUD with the intent to defraud HUD and with the intent unlawfully to defeat its purposes."

Her claim that the 30% discount she received on the two home purchases implicated in her plea do not qualify as "compensation, rebate or reward" within the meaning of the statute is similarly unavailing. Hildenbrand argues that the terms "compensation, rebate or reward" are not statutorily defined and that their common meanings do not encompass a discount. She essentially contends that the statute contemplates only some form of direct payment and, as a result, because she, through CHF, did not receive any direct payment from HUD, her conduct does not violate the statute.

Hildenbrand is correct that the terms "compensation," "rebate," and "reward" are not statutorily defined, and research reveals no case from this or any other circuit to provide guidance on the issue. However, a "discount" is clearly encompassed within the ordinary, common-sense meaning of the term "reward," such that the district court's conclusion that the factual basis was sufficient was not clearly erroneous.

Absent a statutory definition or definitive clue, the meaning of the term "reward," must be given its ordinary, "everyday meaning." See Watson v. United States, 128 S. Ct. 579, 583 (2007) (internal quotation marks and citation omitted). Contrary to Hildenbrand's assertion, the everyday meaning of the term "reward," is broad enough to contemplate more than a direct payment to the recipient. Rather, Webster's Third New International Dictionary (1981) defines "reward" as "something that is given in return for good or evil done or received . . . and esp. that is offered or given for some service or attainment." We have no difficulty concluding that a 30% discount offered on a home purchase price in exchange for nonprofit organizations participating in the SFAHP falls within the reach of the broad phrase "something given" in exchange for "some service."[2]

b. Sufficiency of the Factual Basis for Stone's §§ 371 and 666 Convictions.

Stone also challenges the sufficiency of the factual basis to support his pleas. First, he contends that the facts were insufficient to support his plea under count 1, conspiracy to commit theft against an organization receiving federal assistance, in violation of 18 U.S.C. §§ 371 and 666. Section 666 applies to an "organization, government, or agency [that] receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance." 18 U.S.C. § 666(b). The section to which Stone pleaded guilty prohibits any agent of the organization from embezzling, stealing, defrauding, or unlawfully converting property of the organization valued at $5,000 or more. 18 U.S.C. § 666(a)(1)(A). Section 371 makes it unlawful for two or more persons to conspire to defraud the U.S. or any of its agencies.

---

[2] See also our discussion of the similar term "benefit" infra under § 666 relating to Stone's conviction.

Stone does not challenge the sufficiency of the factual basis to establish a conspiracy. To the extent that he now seeks to challenge his plea on the ground that he did not actually commit any wrongdoing, that he was entitled to all CHF payments he received, that CHF followed all HUD rules and regulations, and that the Government erroneously relied on CHF's internal bookkeeping records to prove the offense, the claims lack merit. The allegations that neither Stone nor CHF committed any wrongdoing are directly refuted by the sworn admissions in Stone's factual resume, which he has never attempted to withdraw. Moreover, Stone does not explain why the Government could not rely on CHF's bookkeeping records to prove the offense particularly in light of that factual resume. Stone's factual resume lists payments to Stone that he admits were not legitimate, i.e. for work he did not actually perform.

The majority of Stone's brief is devoted to the argument that the facts are insufficient to establish a violation of § 666. Similar to the argument Hildenbrand raises, Stone urges that the 10% to 30% discounts CHF received under the SFAHP do not qualify as "benefits" under a federal program involving any "federal assistance" within the meaning of § 666 because such terms contemplate the payment and disbursement of federal funds. He contends that the discounts were merely an incentive and that § 666 does not apply here, where the two parties, HUD and CHF, were engaged in a quid pro quo, purely commercial transaction, with both parties deriving a benefit from the venture.

Stone is correct that the term "benefit" is not statutorily defined. Research reveals no case from this or any other circuit addressing the question whether a HUD discount to a nonprofit organization under the SFAHP constitutes a "benefit" within the meaning of that section. Although, as above, it appears that the term "discount" is encompassed within the ordinary, "everyday meaning" of the term "benefit," the inquiry does not end there as the term "federal assistance" is similarly undefined.

Merriam-Webster's Collegiate Dictionary (10th ed. 2002) defines "benefit" as "something that promotes well-being: ADVANTAGE;" or a "useful aid: HELP." As the Government argues, a discount is, by its very nature, a benefit to the person who receives it; it provides an advantage, useful aid, and help to the recipient. Stone's argument that his construction of "benefit" comports with common sense is unpersuasive. The argument is purely one of form over substance. Although received in the form of a discount, it is undisputed that CHF received a quantitative monetary benefit from HUD through the discounts under the SFAHP. Stone's factual resume lists the monetary value of each discount received by CHF in its purchase of program homes from June 1999 through March 2000, which discounts totaled $152,906.80.[3]

Nevertheless, Stone urges that CHF was not an organization covered by § 666(b) because there was no federal assistance in the absence of any loan or other direct financial assistance from HUD. Even if it is assumed that a discount constitutes a benefit within the meaning of § 666, the benefit must be received through a federal program "involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance." 18 U.S.C. § 666(b). This court has recognized that § 666's definition of federal program and federal assistance is "ambiguous." United States v. Marmolejo, 89 F.3d 1185, 1189 (5th Cir. 1996), aff'd sub nom. Salinas v. United States, 522 U.S. 52 (1997)(Sheriff housing federal prisoners found guilty of violation § 666 for accepting bribes from prisoners in exchange for conjugal visits). "Although it is clear that the assistance can consist of a grant, contract, subsidy, loan, guarantee, or insurance, the other defining qualities of 'Federal assistance' are still unclear." Id. This court held that the term should be broadly construed. Id.

---

[3] That the benefit is intended ultimately to pass to the low-to-moderate-income purchaser of the program homes does not change the result. *See Fischer v. United States*, 529 U.S. 667, 677 (2000) (recognizing that there may be multiple beneficiaries of federal programs).

The Supreme Court has described the coverage of § 666 as "expansive, both as to the [conduct] forbidden and the entities covered." See Fischer, 529 U.S. at 678 (internal quotation marks and citation omitted). This court has noted that "the extent of the federal government's assistance programs will bring many organizations and agencies within the statute's scope," but cautioned that "the statute limits its reach to entities that receive a substantial amount of federal funds." United States v. Westmoreland, 841 F.2d 572, 578 (5th Cir. 1988). In Marmolejo, this court stated that the legislative history behind § 666 "was to protect the integrity of federal funds by punishing theft and bribery involving Federal programs for which there is a specific statutory scheme authorizing the Federal assistance in order to promote or achieve certain policy objectives." 89 F.3d at 1190 (internal quotation marks and citation omitted). For example, health care organizations participating in Medicare are organizations covered by § 666(b). See Fischer, 529 U.S. at 681-82.

Stone appears to urge that the legislative history supports his conclusion that an organization must be the recipient of some direct federal financial assistance to fall within § 666(b). The Government acknowledges that the legislative history indicates that § 666 is designed to protect federally disbursed funds, but it does not squarely address the question whether the statute reaches federal programs that offer some monetary benefit but do not directly disburse funds. Because there is a statutory scheme authorizing the discounts on SFAHP homes and because the scheme furthers the public policy objectives of both expanding home ownership opportunities for low- and moderate-income purchasers and strengthening neighborhoods, we conclude that participation in the SFAHP qualifies as federal assistance.

No cases address the narrow question whether a nonprofit organization receiving discounts on home purchase prices for participating in the SFAHP through HUD is a covered organization under § 666(b) because it receives the

qualifying benefits under a qualifying federal-assistance program. Based on Fischer, SFAHP qualifies as a program receiving federal assistance for purposes of the statute. In Fischer, the defendant was convicted of defrauding a hospital. 529 U.S. at 682. The hospital was a Medicare provider authorized to treat patients covered by Medicare. The Supreme Court found that the funds the hospital received from Medicare patients were benefits under § 666 because the hospital derived significant advantages through satisfaction of the Medicare participation standards imposed by the government. "[I]t cannot be disputed the providers themselves derive significant advantage by satisfying the participation standards imposed by the Government. These advantages constitute benefits within the meaning of the federal bribery statute, a statute we have described as 'expansive,' 'both as to the [conduct] forbidden and the entities covered.'" Id. at 678.

CHF similarly received advantages as a result of satisfying the standards for participating in the SFAHP, which is part of a federal statutory scheme to promote public policy objectives. CHF as well as the renters and buyers of the homes bought and rehabilitated through the program are both beneficiaries of the federal program. See Fischer, 529 U.S. at 677-678. Accordingly, the SFAHP is a federal program involving federal assistance and Stone's challenge to his §§ 371 and 666 convictions on this basis fails.

c. Sufficiency of the Factual Basis for Stone's § 7201 Conviction.

Stone additionally challenges the sufficiency of the factual basis to support his guilty plea to tax evasion for the year 2000. To establish a violation under 26 U.S.C. § 7201, the Government must prove the following elements: 1) a tax deficiency; 2) an affirmative act constituting an evasion or attempted evasion of the tax; and 3) willfulness. United States v. Sallee, 984 F.2d 643, 646 (5th Cir. 1993).

Stone now argues that the factual basis is insufficient to support his plea because the Government failed to establish that the income he was charged with failing to report was actually earned in the calendar year 2000; rather, he now contends that the income was earned in 1999. He further argues that the Government failed to prove any willfulness on his part.

Stone's arguments are squarely controverted by his sworn admissions in the factual resume supporting his plea. Specifically, Stone stipulated that he willfully failed to report $459,427.73 in earned income for the year 2000 by filing a fraudulent tax return and that he knowingly failed to report and pay an additional tax of $179,479 for the 2000 tax year. These stipulated facts establish each element of the § 7201 offense, and Stone's challenge to the sufficiency of the factual basis for his plea to count 35 thus fails.

IV.

For the foregoing reasons, we find that the factual resumes submitted in support of Hildenbrand's and Stone's guilty pleas are sufficient to sustain their convictions. The remaining issues appellants raise are related to their sentences. Because the defendants waived their right to appeal their sentences, we DISMISS THE APPEAL of their sentences, and AFFIRM their convictions.