**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
January 6, 2011

Lyle W. Cayce
Clerk

No. 09-10133

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

LONNIE OLIVER, JR., also known as Jay,

Defendant-Appellant

Appeals from the United States District Court
for the Northern District of Texas

Before GARZA and BENAVIDES, Circuit Judges, and CRONE, District Judge.
CRONE[1], District Judge:

Appellant Lonnie Oliver, Jr. ("Oliver") appeals his convictions and the sentences imposed upon his pleas of guilty to aiding and abetting mail fraud and aggravated identity theft. Pursuant to a conditional plea agreement, he appeals the denial of his motion to suppress and also challenges the voluntariness of his appeal waiver and plea. Finally, Oliver challenges the factual basis supporting his aggravated identity theft conviction.

I.   Background

On December 12, 2007, Oliver was indicted for his participation in a scheme in which he and several co-defendants gained access to others' names,

---

[1] District Judge of the Eastern District of Texas, sitting by designation.

No. 09-10133

social security numbers, and other identifiers and used this information to file for and receive unemployment benefits from the Texas Workforce Commission. The Second Superseding Indictment charged Oliver with ten counts of conspiracy to commit mail fraud in violation of 18 U.S.C. § 1349, mail fraud and aiding and abetting in violation of 18 U.S.C. §§ 1341 and 2, aggravated identity theft and aiding and abetting in violation of 18 U.S.C. §§ 1028A(a)(1) and (2), and theft of federal public money in violation of 18 U.S.C. § 641.

On March 4, 2008, Oliver, through counsel, moved to suppress evidence he contends was unconstitutionally obtained. Specifically, Oliver asserted that federal agents illegally searched the contents of a cardboard box and seized a laptop computer that were turned over to them by his girlfriend. He also sought to suppress incriminating statements he made to federal agents during custodial interrogation, maintaining that the statements were made involuntarily in violation of the Fifth Amendment.

On November 14, 2007, Postal Inspector Marcus Ewing ("Ewing"), along with Department of Labor Agents Steven Grell ("Grell") and Frank Archie ("Archie"), arrested Oliver near his home pursuant to an arrest warrant obtained in connection with the unemployment benefits scheme investigation. Oliver allowed the agents to take him back to his residence and talk with him. Agents Ewing and Grell asked Oliver if he wanted to answer questions, and he responded affirmatively. Before any questioning commenced, however, Agent Ewing advised Oliver of his *Miranda* rights and presented him with two forms: one acknowledging that he understood his rights and one waiving those rights. Oliver signed the form acknowledging that he understood his rights, but he refused to sign the waiver form. Nevertheless, Oliver stated that he wished to answer the agents' questions. Thereafter, Oliver confessed to his role in the scheme. Oliver also consented to a search of his car, but he declined to consent to a search of his home. During the interview (which lasted between an hour

2

No. 09-10133

and a half and two hours), Oliver never asked for an attorney and never refused to speak with agents. Part way through the interview, Agent Archie arrived and asked Oliver how he was being treated. Oliver responded that the agents were treating him respectfully.

Following Oliver's arrest, federal agents learned from Oliver's co-defendant, Albert Henson, Jr. ("Henson"), that Oliver stored a laptop computer and a cardboard box containing documents and debit/credit cards related to the scheme at the apartment of Oliver's girlfriend, Erica Armstrong ("Armstrong").[2]   Acting on this information, Agent Heather McReynolds ("McReynolds") and another agent went to the apartment, where Armstrong gave her the box and the laptop computer.

At the suppression hearing, Armstrong stated she observed Oliver—who told her he worked from home—using a laptop and a notebook. According to Armstrong, she first became aware of Oliver's cardboard box when, before traveling out of town, he informed her that he had left it in her apartment under her bed. Armstrong testified that, at that time, although the box was not taped, Oliver cautioned her not to "mess with" or "touch" the box. Subsequently, Armstrong noticed that he had moved the box from underneath her bed into the dining room. After Oliver had not been in contact with Armstrong for several days, she looked through the box for information to contact him. In the box, Armstrong found a notebook, a ziplock bag containing credit cards, a white envelope containing identification cards, and other loose paperwork resembling tax documents. Later that day, Agent McReynolds arrived at her apartment inquiring about Oliver. Armstrong did not reveal, and federal authorities were unaware, that Armstrong had already searched the box when she handed it over to McReynolds and agents subsequently examined its contents. According to the

---

[2] Documents from the district court spell Armstrong's first name as "Erika," but the appellate briefs spell it "Erica."

3

affidavit in support of the warrant to search the laptop computer, filed after its seizure, the box contained "hundreds of personal identifiers, including names, dates of birth, and social security numbers." The affidavit further stated that most of the identities used to file benefits claims were inside the box and that the box also contained "sixteen debit cards in the names of victims identified in [the] case." Agents also searched the pockets of various articles of clothing that Oliver had left at Armstrong's apartment and retrieved a piece of paper with handwriting on it.

On April 25, 2008, the district court denied Oliver's motion to suppress. The district court held that Oliver's refusal to sign the waiver was insufficient to establish that his statements were involuntary, reasoning that Oliver manifested an intent to waive his Fifth Amendment rights by his conduct. With regard to the search of the cardboard box, the district court determined that the search was permissible under the private search doctrine, reasoning that the agents's subsequent search of the box did not exceed the scope of Armstrong's private search and, thus, it did not violate Oliver's Fourth Amendment rights. The court also held that, even if the initial seizure of the laptop was unlawful, the government's subsequent seizure and search of the laptop were constitutional under the independent source doctrine.

On May 2, 2008, Oliver's court-appointed counsel moved to withdraw, stating that an antagonistic relationship had developed between him and Oliver. Oliver twice confirmed that the relationship with his lawyer had broken down; first, in a motion for dismissal of his attorney and, again, in a "Second Judicial Notice" complaining of his attorney's performance. The district court granted the motion and appointed Oliver a new attorney. Subsequently, Oliver moved to proceed *pro se*, and Oliver's attorney also filed a separate motion explaining that Oliver wished to represent himself with standby counsel. After holding a hearing, the court allowed Oliver to proceed *pro se* with standby counsel.

No. 09-10133

In the weeks leading up to the scheduled trial date of July 14, 2008, Oliver filed over thirty *pro se* motions, including two nearly identical motions to reconsider the denial of the motion to suppress, which were filed on July 9, 2008, three business days before trial was set to begin and four months after the pretrial motions deadline had passed.[3]   In his motion to reconsider, Oliver asserted that newly discovered computer records revealed that federal agents accessed the data on the laptop computer before they secured a warrant.  He also argued, for the first time, that the search of the pockets of his clothing at Armstrong's home was unconstitutional.  Further, Oliver contended that the district court misapplied the private search doctrine and reasserted his argument that he did not waive his Fifth Amendment rights before making incriminating statements to agents after his arrest.

At the pretrial conference held on July 11, 2008, Agent McReynolds testified that, while handling the computer, she inadvertently switched it out of the "sleep" mode and later turned it off.  Daryl Ford ("Ford"), a postal inspector responsible for analyzing digital evidence, testified that the laptop's log was consistent with McReynolds's account and did not reflect that any document files or other information stored on the computer were accessed before the warrant was secured.  The district court orally denied Oliver's motion to reconsider and indicated that a written ruling was forthcoming.

On July 14, 2008, the day trial was set to begin, Oliver entered into a conditional plea agreement with the government.  Oliver pleaded guilty to one count of aiding and abetting mail fraud and one count of aggravated identity theft while reserving the right to appeal the denial of his motion to suppress.

At the rearraignment hearing, the government stated that the plea agreement would allow Oliver to appeal both the district court's denial of the

---

[3] For simplicity, this opinion refers to Oliver's two motions for reconsideration as one motion for reconsideration.

motion to reconsider and the motion to suppress. Oliver confirmed this was his understanding, as well. The court then proceeded to the plea colloquy, during which Oliver represented himself, with standby counsel at his side. The judge again discussed the appeal waiver contained in the plea agreement and the factual basis underlying the plea. Oliver indicated that he understood and entered a plea of guilty, which the district court accepted.

Subsequently, the district court issued a memorandum and order denying Oliver's motion to reconsider the motion to suppress, crediting Ford's testimony at the pretrial conference and concluding that the government did not conduct a search of the laptop computer before it obtained a search warrant. The district court also found that Oliver waived his right to challenge the search of his clothes pockets because he waited until the week before trial to raise the issue. Finally, the court again rejected Oliver's arguments regarding the private search doctrine and the incriminating statements made to authorities after his arrest.

Before sentencing, on November 13, 2008, Oliver moved to reassert his right to counsel, asking that standby counsel be dismissed and a different attorney appointed to represent him. A week later, the district court granted the motion, and a new lawyer was appointed to represent Oliver at sentencing. At sentencing, the district court ruled on the myriad objections to the presentence report raised by Oliver. Ultimately, the district court determined that Oliver's offense level was 23—which included increases for being an organizer or leader of the scheme and for an intended loss in excess of $400,000—and that his criminal history category was VI, resulting in a guidelines imprisonment range of 92 to 115 months. After considering all of the factors contained in 18 U.S.C. § 3553(a), the judge sentenced Oliver to prison terms of 115 months on the mail fraud count and 24 months on the identity theft count, to be served consecutively.

No. 09-10133

Following his sentencing, Oliver filed a litany of post-conviction motions, including a motion to reinstate his appeal rights, which was based on claims of ineffective assistance by his standby counsel and the involuntariness of his guilty plea and appeal waiver. The district court denied the motion, and this appeal followed.

II.   Discussion

A.   Suppression Motions

This court reviews factual findings, including credibility determinations, for clear error and legal conclusions *de novo*. *See United States v. Garcia*, 604 F.3d 186, 190 (5th Cir. 2010); *see also United States v. Montes*, 602 F.3d 381, 384-85 (5th Cir. 2010); *United States v. London*, 568 F.3d 553, 561 (5th Cir. 2009). "'A factual finding is not clearly erroneous as long as it is plausible in light of the record as a whole.'" *Montes*, 602 F.3d at 384 (quoting *United States v. Jacquinot*, 258 F.3d 423, 427 (5th Cir. 2001)). "Where a district court's denial of a suppression motion is based on live oral testimony, the clearly erroneous standard is particularly strong because the judge had the opportunity to observe the demeanor of the witnesses." *Montes*, 602 F.3d at 384; *London*, 568 F.3d at 561. The evidence is viewed in the light most favorable to the prevailing party—here, the government. *Montes*, 602 F.3d at 384-85; *London*, 568 F.3d at 561.

1.   Contents of the Cardboard Box

Oliver argues that the district court improperly denied his motion to suppress evidence found in the cardboard box left in Armstrong's apartment, including a ziplock bag containing credit cards, a white envelope containing identification cards, a notebook, and some loose paperwork. He contends that the district court erred in relying on the private search doctrine in upholding the legitimacy of the search because the private search doctrine is inapplicable where police are unaware of a prior private search. Oliver also challenges the

7

district court's factual finding that Armstrong searched the box and the plastic bag it contained. In addition, he maintains that the police search of the notebook exceeded the scope of the private search.

The Fourth Amendment proscribes "unreasonable searches and seizures." U.S. CONST. AMEND. IV; *accord Garcia*, 604 F.3d at 190; *United States v. Scroggins*, 599 F.3d 433, 440 (5th Cir. 2010). But for a few exceptions, warrantless searches and seizures are "*per se* unreasonable." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (internal quotation marks omitted). A search occurs when "an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). Assuming, without deciding, that Oliver initially possessed a reasonable expectation of privacy in the cardboard box and its contents, the district court did not err in failing to suppress the evidence obtained because a private search of the box had already occurred. The Fourth Amendment does not protect against searches conducted by private individuals acting in a private capacity. *Jacobsen*, 466 U.S. at 113; *United States v. Runyan*, 275 F.3d 449, 457 (5th Cir. 2001). Rather, it proscribes only governmental action and is "wholly inapplicable 'to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any government official.'" *Jacobsen*, 466 U.S. at 113-14 (quoting *Walter v. United States*, 447 U.S. 649, 662 (1980) (Blackmun, J., dissenting)).

Where a private individual examines the contents of a closed container, a subsequent search of the container by government officials does not constitute an unlawful search for purposes of the Fourth Amendment as long as the government search does not exceed the scope of the private search. *Jacobson*, 466 U.S. at 115; *Runyan*, 275 F.3d at 460-61. "'[T]his court has recognized that a police view subsequent to a search conducted by private citizens does not

constitute a "search" within the meaning of the Fourth Amendment so long as the view is confined to the scope and product of the initial search.'" *Runyan*, 275 F.3d at 458 (quoting *United States v. Bomengo*, 580 F.2d 173, 175 (5th Cir. 1978)); *see United States v. Paige*, 136 F.3d 1012, 1019 (5th Cir. 1998); *see also United States v. Miller*, 152 F.3d 813, 815 (8th Cir. 1998) ("[T]o be a Fourth Amendment search, a governmental intrusion must infringe on a legitimate expectation of privacy. Because a private search frustrates such an expectation . . . an ensuing police intrusion that stays within the limits of the private search is not a search for Fourth Amendment purposes.") (internal citations omitted). A defendant's expectation of privacy with respect to an item unopened by the private searcher is preserved, however, unless the defendant's expectation of privacy in the contents of the container has already been frustrated because the contents were rendered obvious by the private search. *Runyan*, 275 F.3d at 463-64. "Language from the Supreme Court's *Jacobsen* opinion suggests that the critical inquiry under the Fourth Amendment is whether the authorities obtained information with respect to which the defendant's expectation of privacy has not already been frustrated. Thus, *Jacobsen* directs courts to inquire whether the government learned something from the police search that it could not have learned from the private searcher's testimony and, if so, whether the defendant had a legitimate expectation of privacy in that information." *Runyan*, 275 F.3d at 461 (citing *Jacobsen*, 466 U.S. 118-20).

When confronted with situations where, as here, the police search items found within a residence after a private search has already been conducted, a defendant may retain a reasonable expectation of privacy following the private search under certain circumstances. *Paige*, 136 F.3d at 1020. To determine whether a defendant's reasonable expectation of privacy survives a private search, "consideration must be given to whether the activities of the home's occupants or the circumstances within the home at the time of the private search

created *a risk of intrusion by the private party that was reasonably foreseeable.*" *Id.* (emphasis added). "If indeed the private party's intrusion was reasonably foreseeable (based on such activities or circumstances), the occupant will no longer possess a reasonable expectation of privacy in the area or thing searched, and the subsequent police search will not trigger the Fourth Amendment. If, however, the private party's initial intrusion was not reasonably foreseeable, the occupant's reasonable expectation of privacy will survive, and the subsequent police search will indeed activate the Fourth Amendment." *Id.*

Oliver first argues that the private search doctrine is inapplicable because, at the time the agents searched the cardboard box, they did not know that Armstrong had already searched it and, thus, were not aware of the scope of Armstrong's search. Oliver points to no case, however, which expressly holds that police knowledge of a prior private search is necessary.[4] Moreover, language from *Paige*, which focuses on a defendant's reasonable expectation of privacy as to the private searcher, indicates that it is the private search itself that frustrates the privacy expectation: "If indeed the private party's intrusion was reasonably foreseeable . . . , the occupant will no longer possess a reasonable expectation of privacy in the area or thing searched, and the subsequent police search will not trigger the Fourth Amendment." *Id.* Therefore, it is the private search itself, and not the authorities' learning of such search, that renders a police officer's subsequent warrantless search permissible.

In the present case, it is undisputed that Armstrong and Oliver had a personal relationship and had been dating for several weeks, although

---

[4] The court has not located any cases addressing the private search doctrine in which the police were unaware at the time of the police search that a private search had already been conducted. Admittedly, in most, if not all, cases involving the private search doctrine, the police are aware that a private search has already been conducted because the police are summoned when the private searcher discovers suspicious materials. *See Jacobsen*, 466 U.S. at 120 n.17. The court recognizes that there is language in *Jacobsen* suggesting that prior knowledge of a private search is relevant; however, as stated above, no case expressly requires such knowledge.

10

No. 09-10133

Armstrong testified that she did not know Oliver's last name until she was informed of it by federal authorities. Oliver sometimes stayed as an overnight guest in her home and left personal belongings, including the box, in her apartment. As part of her investigation, McReynolds visited Armstrong at her apartment to inquire about Oliver and the items he had left in her home. While the agents were there, Armstrong telephoned Henson's girlfriend, Bree, who, according to Armstrong, advised her to "get rid of anything that Lonnie left at [her] house." During this visit, Armstrong readily and willingly gave McReynolds the box, which she had already searched, as it was not locked or otherwise safeguarded and was left in her dining room. Oliver's decision to leave his unsecured cardboard box in an easily accessible and common area of the apartment for several days without notifying or otherwise communicating his whereabouts to Armstrong made it reasonably foreseeable that she would examine his belongings, including the box, to look for a way to contact him. Given these circumstances, the court finds that the initial private search, which was reasonably foreseeable, and the searcher's act, later that day, of voluntarily giving authorities the box, in which no reasonable expectation of privacy remained, rendered the subsequent police search permissible under the Fourth Amendment. This holding, however, is limited to the unique facts of this case and is not intended to expand significantly the scope of the private search doctrine.

To the extent that Oliver contends that Armstrong's testimony that she searched the box and the plastic bag it contained was unsubstantiated, his argument fails. The district court legitimately credited Armstrong's testimony that she, in fact, searched the box and the bag. This factual finding is supported by Armstrong's ability to describe accurately the contents of both the box and the bag. Because there was support in the record for the district court's finding, it

is not clearly erroneous. *See United States v. Menchaca-Castruita*, 587 F.3d 283, 289 (5th Cir. 2009).

Oliver next takes issue with the district court's implied conclusion that the notebook was not a separate, closed container, or at least an object in which Oliver possessed a reasonable expectation of privacy. Specifically, Oliver argues that even if the private search doctrine applies to the warrantless search of the box, it does not apply to the notebook, as Armstrong never searched the notebook. The government responds that the agents' search of the notebook did not exceed the scope of Armstrong's private search because her search rendered the contents of the notebook obvious.

Although Armstrong did not conduct a separate search of the notebook, the government agents' subsequent search of the notebook was nonetheless lawful, as its contents were obvious. The words "business ideas" appeared on the front cover, and a loose sheet of paper revealing a victim's name and personal identifying information protruded from the side of the notebook. Oliver does not contend that this description of the notebook is inaccurate. Based on these characteristics, and given the agents' expertise, they could readily ascertain that the notebook contained Oliver's notes regarding the fraudulent unemployment benefits scheme about which Oliver had previously confessed. Because the notebook's contents were obvious, agents did not exceed the scope of Armstrong's private search.[5]

### 2.   Laptop Computer

Oliver also objects to the district court's ruling that the contents of the laptop computer were admissible under the independent source doctrine.

---

[5] The court notes that *Paige* applies only where a subsequent police search does not exceed the scope of the prior private party search. *United States v. Barth*, 26 F. Supp. 2d 929, 937 (W.D. Tex. 1998). As discussed above, because the subsequent search in this case did not exceed Armstrong's search, Oliver's Fourth Amendment rights were not implicated by a police review of the notebook.

Evidence not obtained as a result of police illegality, but rather through a legal, independent source, need not be suppressed. *United States v. Moore*, 329 F.3d 399, 404 (5th Cir. 2003) (citing *Murray v. United States*, 487 U.S. 533, 537 (1988)). "Under the independent source doctrine, if not even the but for test can be met [so that the evidence would not have been found but for police illegality], then clearly the evidence is not a fruit of the prior Fourth Amendment violation." *Id.* (internal quotation marks omitted) (quoting 5 Wayne LaFave, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 11.4(a), at 236 (3d ed. 1996)).

Oliver contends that Agent McReynolds's affidavit in support of the warrant relied on evidence that was illegally obtained. Oliver does not specifically identify the purportedly illegal evidence upon which McReynolds relied. To the extent Oliver refers to the cardboard box and its contents, his argument fails because, as explained above, the search of the box was permissible. To the extent Oliver complains of the original seizure of the laptop, his argument is similarly unavailing. As correctly noted by the district court, unlawfully obtained evidence need not be suppressed if officials later reseize the evidence from a "distinct, untainted source." *See United States v. Grosenheider*, 200 F.3d 321, 327 (5th Cir. 2000). Even without mentioning the original seizure of the laptop, the affidavit contains sufficient information to make the resulting warrant a distinct, untainted source, permitting agents to reseize and search the laptop. In her affidavit, McReynolds relies on information provided by Oliver and Henson, who both admitted to using a laptop computer to submit fraudulent unemployment claims. McReynolds also states in the affidavit that Henson revealed the location of the laptop—Armstrong's apartment. She also recounts Armstrong's statements that Oliver used the laptop while looking at documents later found by federal agents to contain identifying information for various individuals. In this circumstance, the affidavit contained sufficient independent

information to make the resulting warrant a distinct, untainted source that permitted the agents to reseize and search the laptop lawfully.

Oliver also argues that the federal agents were improperly motivated to seek the warrant by information they obtained through a warrantless search of the computer on November 21, 2008, the day after it was initially seized. There is no basis for this assertion in the record. On July 11, 2008, the district court held a hearing to address computer logs that Oliver argued established that agents had searched the computer before they received the warrant. Based on Postal Inspector Ford's testimony, Oliver's evidence showed only that the computer went through normal hibernation and shut down functions before the date of the warrant. Thus, the district court's conclusion that no search occurred is not clearly erroneous. *See Menchaca-Castruita*, 587 F.3d at 289.

### 3.   Incriminating Statements

In his motion to suppress and motion for reconsideration, Oliver argues that the incriminating statements he made to federal agents after his arrest should have been suppressed, as he did not waive his Fifth Amendment rights. The government counters that, notwithstanding Oliver's refusal to sign the waiver-of-rights form, Oliver's willingness to discuss the scheme with them indicated that he waived his right to remain silent.

A suspect may waive his *Miranda* rights "provided the waiver is made voluntarily, knowingly, and intelligently." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). "For [a] confession to be admissible at trial the government ha[s] to show that [the defendant] was informed of his *Miranda* rights and that his waiver thereof and the resultant confession were the product of a free and deliberate choice." *United States v. Collins*, 40 F.3d 95, 98 (5th Cir. 1994) (internal quotation marks omitted); *see also Berghuis v. Thompkins*, ___ U.S. ___, 130 S. Ct. 2250, 2260 (2010); *United States v. Chapa-Garza*, 62 F.3d 118, 121 (5th Cir. 1995). Whether a defendant has waived his rights under *Miranda*

"present[s] a factual question for the district court." *Collins*, 40 F.3d at 98-99. "Such waivers may be direct or, in some instances, they may 'be clearly inferred from the actions and words of the person interrogated.'" *Id*. at 99 (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)). "The mere refusal to sign a written waiver does not automatically render inadmissible all further statements made by the defendant." *Chapa-Garza*, 62 F.3d at 122 (citing *United States v. McDaniel*, 463 F.2d 129, 135 (5th Cir. 1972)); *see Berghuis*, 130 S. Ct. at 2262. Indeed, "[a] refusal to sign a waiver may indicate nothing more than a reluctance to put pen to paper under the circumstance of custody." *McDaniel*, 463 F.2d at 135; *see Berghuis*, 130 S. Ct. at 2264. Moreover, "a suspect who has received and understood the *Miranda* warnings, and has not invoked his *Miranda* rights, waives the right to remain silent by making an uncoerced statement to the police." *Berghuis*, 130 S. Ct. at 2264. Here, after considering the circumstances surrounding Oliver's arrest and interview, we find that the district court correctly determined that Oliver's waiver was voluntary despite his refusal to sign the waiver form given to him by Agent Ewing. *See Berghuis*, 130 S. Ct. at 2262; *Chapa-Garza*, 62 F.3d at 122. Ewing gave Oliver a paper copy of the 1067 warning waiver form and read it aloud as Oliver followed along. According to Agents Ewing and Grell, Oliver expressly stated that, although he did not wish to sign the waiver form, he would discuss the fraud scheme. At no point did Oliver request an attorney. In addition, three different agents (Ewing, Grell, and Archie) testified that Oliver was articulate, coherent, not under the influence of alcohol or drugs, and otherwise appeared to know exactly what was going on. Moreover, as noted by the district court, Oliver clearly understood his rights, as evidenced by his signing the form explaining them and his extensive history in the criminal justice system. Further, Oliver was not coerced, as evidenced by his conduct during the interview and his statement to Agent Archie that he was being treated respectfully. Because there is ample evidence in the

record to support the determination that Oliver waived his Fifth Amendment rights before making incriminating statements, the district court did not clearly err. *See Berghuis*, 130 S. Ct. at 2262; *Chapa-Garza*, 62 F.3d at 122.

### 4.   Clothes Pockets

Oliver next contends that the district court abused its discretion by failing to consider the merits of his argument that the government violated his Fourth Amendment rights by searching his clothes pockets without a warrant. A district court's denial of an untimely motion to suppress as waived is reviewed for an abuse of discretion. *See United States v. Knezek*, 964 F.2d 394, 397 (5th Cir. 1992). This argument was raised for the first time in Oliver's motion for reconsideration, filed on July 8, 2008, one week before the trial setting and over four months after the March 4, 2008, deadline to file pre-trial motions. The district court denied the untimely motion, reasoning that Oliver waived any argument regarding the evidence found in his pockets.

Oliver contends that the late filing does not constitute waiver for two reasons. First, according to Oliver's interpretation of the rearraignment proceeding, the parties and the district court agreed that "the substantive issues that Mr. Oliver raised in the motion to reconsider would be treated just as the issue raised in the initial motion to suppress and equally preserved for appeal." Second, Oliver asserts that, as a *pro se* defendant, he lacked sufficient knowledge of procedure to know when and how to move for reconsideration.

With regard to Oliver's first argument, a review of the rearraignment proceeding reveals that the parties and the district court agreed only that Oliver would be able to appeal the denials of his motions to suppress and for reconsideration, not the merits of each issue raised. When the hearing opened, the district court asked whether the parties contemplated that "Mr. Oliver would have the right to appeal that denial of his motion for reconsideration" and whether "the court's reasoning in denying the motion for reconsideration would

also be available to the government in defending the court's position or ruling." The government agreed that Oliver could appeal the ruling, explaining that the right to appeal "would in fact encompass the court's denial of the motion—the motion to reconsider that the court considered at the pretrial conference and also any reasoning that the court might articulate in a written order." Oliver agreed that he "would also be able to appeal the denial of the motion for reconsideration" and that the government could rely on any subsequent written ruling addressing the motion. Through these exchanges, it is clear that the government and Oliver agreed that Oliver could appeal the district court's decision denying the motion for reconsideration and that the government could use the district court's written reasoning to defend its position. It is true, as Oliver points out, that the government stated that the issues raised in both motions were "very nearly the same" and that the district court described them as "arguably intertwined," but these characterizations, in the context of the discussion as a whole, do not support Oliver's conclusion that an issue he first addressed in his motion for reconsideration should be treated as if he had raised it months earlier in his original motion.

Oliver's second argument is also unpersuasive. Rule 12(c) of the Federal Rules of Criminal Procedure authorizes a district court to set a deadline for the filing of pretrial motions, including motions to suppress evidence. FED. R. CRIM. P. 12(c). A defendant waives suppression issues not raised by the district court's deadline. FED. R. CRIM. P. 12(e). In the instant case, the district court set a March 4, 2008, deadline for filing pretrial motions. On June 10, 2008, at the hearing in which the court granted Oliver permission to proceed *pro se*, the district court specifically noted that the deadline for filing pretrial motions had expired. Nevertheless, on July 9, 2008, only three business days before trial was set to begin and over four months after the pretrial motions deadline, Oliver moved for reconsideration of the denial of his motion to suppress. The district

court refused to consider the merits of Oliver's argument because of his decision to ignore the judge's prior instruction to seek leave of court and to wait until the eve of trial to file his motion for reconsideration, not because of his lack of knowledge of procedure. Accordingly, the district court did not abuse its discretion in concluding that Oliver waived his argument that the paper found in his clothes pocket should be suppressed. *See Knezek*, 964 F.2d at 397.

B.   Appeal Waiver

Oliver contends that the district court failed to comply with the requirements of Federal Rule of Criminal Procedure 11(b)(1)(N), rendering his appeal waiver ineffective. Specifically, Oliver complains that the district court's description of the appeal waiver was confusing and that the judge failed to ensure that Oliver understood the terms of the plea agreement, particularly the exceptions.

Rule 11(b)(1)(N) requires the district court, before accepting a plea of guilty, to address the defendant personally in open court and to make sure the defendant understands the terms of any plea agreement provision waiving the right to appeal or to attack the sentence collaterally. FED. R. CRIM. P. 11(b)(1)(N). Because Oliver did not specifically object to the district court's plea colloquy as it pertains to Rule 11(b)(1)(N), this court reviews for plain error. *United States v. Vonn*, 535 U.S. 55, 59 (2002); *United States v. Reyna*, 358 F.3d 344, 354 (5th Cir.) (Jones, J., concurring). The plain error inquiry requires Oliver to demonstrate that his substantial rights were affected by the district judge's alleged failure to explain the terms of the appeal waiver adequately. *United States v. Villegas*, 404 F.3d 355, 358 (5th Cir. 2005). When reviewing under a plain error standard, this "court may consult the whole record when considering the effect of any error on substantial rights." *Vonn*, 535 U.S. at 59. Moreover, to justify reversal for a district court's error in a Rule 11 admonishment, the defendant "must show a reasonable probability that, but for

the error, he would not have entered the plea." *United States v. Dominguez Benitez*, 542 U.S. 74, 83 (2004). In addition, this court may correct a plain error only if it "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *United States v. Olano*, 507 U.S. 725, 732 (1993) (internal quotation marks omitted).

Here, the district court informed Oliver that he would be permitted to appeal the denials of the motion to suppress and the motion for reconsideration, but it stated that Oliver would not be allowed to appeal the denials of the other motions he filed. In addition, the district court confirmed that Oliver had read the plea agreement, including the appeal waiver, and explained that the waiver applied to the right to appeal and to bring a post conviction challenge "except in very limited circumstances as contained in paragraph 10 and under the limited circumstances contained in paragraph 2 as orally supplemented and explained here in this proceeding." (Paragraph 10 is the general appeal waiver provision, and paragraph 2 pertains to Oliver's ability to appeal suppression issues.) When asked whether he understood the district court's admonishment in this regard, Oliver responded that he did. Nevertheless, the district court again asked Oliver whether he knew "the rights you were giving up when you pled to paragraph 10," and Oliver again responded affirmatively. The district court gave Oliver several opportunities to ask questions, seek clarification, or request further explanation, but each time he declined. Moreover, Oliver was told at the outset that the district court would gladly grant any request for additional time. Though the court did not read the appeal waiver to Oliver (Oliver, in fact, waived reading of the plea agreement), the district court's colloquy was sufficient to ensure that Oliver understood the terms of the waiver. *See United States v. Gonzalez*, 259 F.3d 355, 358 (5th Cir. 2001). Accordingly, the court perceives no error.

C.      Motion to Reinstate

In a related argument, Oliver challenges the district court's denial of his motion to reinstate his right to appeal. As a threshold matter, in his motion, Oliver did not ask the district court for permission to withdraw his guilty plea or to void his plea agreement. Rather, he requested the district court to reinstate his right to appeal, which, in effect, asked the district court to modify or rewrite the plea agreement.

"'Plea bargain agreements are contractual in nature, and are to be construed accordingly.'" *United States v. Garcia*, 606 F.3d 209, 215 (5th Cir. 2010) (quoting *Hentz v. Hargett*, 71 F.3d 1169, 1173 (5th Cir. 1996)); *United States v. Story*, 439 F.3d 226, 231 (5th Cir. 2006) ("We analyze waivers of appeal in plea agreements using contract law.") (citing *United States v. Cantu*, 185 F.3d 298, 304 (5th Cir. 1999)). "They bind the parties, and, more importantly, the court, too, is bound once [it] accepts the plea agreement." *Garcia*, 606 F.3d at 215 (internal quotation marks omitted). Indeed, once a district court has accepted a plea agreement, it generally may not later reject or modify it. *McClure v. Ashcroft*, 335 F.3d 404, 413 (5th Cir. 2003); *see also United States v. Self*, 596 F.3d 245, 249 (5th Cir. 2010) (concluding that a plea agreement under 11(c)(1)(A) may not be accepted or rejected on a piecemeal basis) (citing *In re Morgan*, 506 F.3d 705, 709 (9th Cir. 2007)). Consistent with these authorities, Oliver's request to reformulate the plea agreement is without merit. Accordingly, the district court did not err in denying Oliver's motion.

Oliver also challenges the district court's denial of his motion to reinstate his appeal right on the basis that he unknowingly and involuntarily agreed to the appeal waiver as a result of the alleged ineffective assistance of his standby counsel. Specifically, Oliver contends that his standby counsel incorrectly advised him that he would be permitted to appeal "the enhancements that increase Oliver's sentence under the arithmetic error provision that has been

preserved for appellate review." Because the voluntariness of Oliver's plea was raised and rejected in the district court, this issue is reviewed *de novo*. *United States v. Amaya*, 111 F.3d 386, 388 (5th Cir. 1997). "The defendant must know that he had 'a right to appeal his sentence and that he was giving up that right.'" *Gonzalez*, 259 F.3d at 357 (quoting *United States v. Portillo*, 18 F.3d 290, 292 (5th Cir. 1994)).

Other than Oliver's conclusory assertion that his standby counsel advised him he could appeal his sentences, the record is not sufficiently developed as to whether Oliver's standby counsel, in fact, incorrectly told him that he could appeal his sentence enhancements. Indeed, the district court rejected this argument, reasoning that "it is questionable whether any attorney would advise a defendant that the exclusion from an appeal waiver of a claim of 'an arithmetic error at sentencing' would allow the defendant to appeal the sentence (including the court's calculation of the advisory guideline range)." As the district court noted, "[s]uch an exception to the appeal waiver would effectively nullify the waiver, because the advisory guideline range must always be calculated before the sentence is determined." Even if Oliver's standby counsel erroneously informed him about his appeal waiver, the record reflects that Oliver was correctly informed about his appeal waiver both at the plea hearing and in his written plea agreement, which Oliver signed and testified under oath that he had read. *See Gonzalez*, 259 F.3d at 357 (stating that defendant's "signed plea agreement informed him of the right to appeal his sentence and that he would be waiving that right by pleading guilty, except under the circumstances enumerated"); *see also United States v. McKinney*, 406 F.3d 744, 746 (5th Cir. 2005) (stating that where "'the record of the Rule 11 hearing clearly indicates that a defendant has read and understands his plea agreement, and that he has raised no question regarding a waiver-of-appeal provision, the defendant will be held to the bargain to which he agreed, regardless of whether the court

specifically admonished him concerning the waiver of appeal.'" (quoting *Portillo*, 18 F.3d at 293); *United States v. Vasquez-Garcia*, 244 F.3d 136, 136 (5th Cir. 2000) (unpublished table decision) ("'[R]eliance on the erroneous advice of counsel relative to the sentence likely to be imposed does not render a guilty plea unknowing or involuntary.'") (quoting *United States v. Santa Lucia*, 991 F.2d 179, 180 (5th Cir. 1993)).

Moreover, as a *pro se* defendant, Oliver had no constitutional right to standby counsel. *See United States v. Morrison*, 153 F.3d 34, 55 (5th Cir. 1998); *United States v. Mikolajczyk*, 137 F.3d 237, 246 (5th Cir. 1998); *United States v. Martin*, 790 F.2d 1215, 1218 (5th Cir. 1986). "[W]ithout a constitutional right to standby counsel, a defendant is not entitled to relief for the ineffectiveness of standby counsel." *Morrison*, 153 F.3d at 55. Although Oliver acknowledges that he had no right to standby counsel, he argues that he proceeded *pro se* only to challenge the court's suppression ruling. According to Oliver, once he raised this issue, he relied on his standby counsel entirely. The record flatly contradicts Oliver's assertions. While proceeding *pro se*, Oliver filed over thirty motions and represented himself during jury selection. Although he consulted with standby counsel during the rearraignment hearing, nothing in the transcript of that hearing suggests that counsel was acting as Oliver's lawyer. Rather, Oliver retained control of his own defense until shortly before sentencing, when he requested and was appointed new counsel. Because Oliver had no constitutional right to standby counsel and because Oliver acted as his own counsel while he was proceeding *pro se*, he cannot prevail on a claim that standby counsel was ineffective. *See Morrison*, 153 F.3d at 55.

In short, none of Oliver's arguments compel the conclusion that his plea or the appeal waiver was unknowing or involuntary. The record reveals that Oliver understood the nature of the charges, was admonished as to the constitutional rights he was waiving, and was advised of the potential sentences

he faced. In addition, Oliver confirmed that he was entering a knowing and voluntary plea that was not the result of threats, undisclosed promises, or "side deals" not contained in the plea agreement. Every time Oliver was asked if he understood the court's admonishments, he answered affirmatively. "Solemn declarations in open court carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977) ("The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible."); *United States v. Washington*, 480 F.3d 309, 316 (5th Cir. 2007) (holding that the defendant's "statements that his plea was knowing and voluntary and that he understood the rights he was waiving create a presumption that in fact the plea is valid") (internal quotation marks omitted).

In that same vein, the court did not err in failing to hold an evidentiary hearing to investigate the issue further, as Oliver stated under oath at the rearraignment hearing that he had read and understood the plea agreement. *See United States v. Cervantes*, 132 F.3d 1106, 1111 (5th Cir. 1998) (finding no error in district court's refusal to hold an evidentiary hearing on ineffective assistance of counsel claim where, at rearraignment, the judge reiterated much of what was set forth in the plea agreement, which the defendant represented to the court that she read and understood); *Clark v. Collins*, 19 F.3d 959, 964 (5th Cir. 1994).

Oliver also argues that the waiver of the right to appeal his sentences violates *United States v. Booker*, 543 U.S. 220 (2005), because it is over broad. Without citing any authority, Oliver states that an appeal waiver that prevents a defendant from challenging his sentence on any ground, including reasonableness, violates *Booker*.[6]   Contrary to Oliver's assertion, nothing in

---

[6] Notably, Oliver's plea agreement does not contain a blanket appeal waiver, as it states that Oliver retains the right (a) to bring a direct appeal of (i) a sentence exceeding the

*Booker* prohibits appeal waivers. Furthermore, plea agreements are contracts, and defendants can contract away the right to appeal their sentences. *See Story*, 439 F.3d at 231. In any event, Oliver's sentences of 115 months for Count 5 and 24 months for Count 7 were not in excess of the statutory maximums of 20 years for Count 5 and 2 years for Count 7.

Oliver challenges his sentences on appeal, contending that the district court incorrectly calculated the amount of loss and erred in applying the leadership sentencing enhancement. Because he knowingly and voluntarily waived the right to appeal his sentences, except in limited circumstances that do not apply here, and because the government has invoked the waiver provision, this court will not consider his arguments. *See Story*, 439 F.3d at 230-31; *United States v. Bond*, 414 F.3d 542, 544 (5th Cir. 2005).

D.     Factual Basis for Identity Theft Conviction

Oliver argues that the government did not establish that he knew that the names and social security numbers of his victims belonged to real persons. Oliver failed to object in the district court on these grounds. Therefore, this court reviews for plain error. *See United States v. Castro-Trevino*, 464 F.3d 536, 541 (5th Cir. 2006); *United States v. Marek*, 238 F.3d 310, 315 (5th Cir. 2001) (en banc).

Before accepting a guilty plea, the district court must determine that the conduct admitted by the defendant "is sufficient as a matter of law to constitute a violation of the statute." *Marek*, 238 F.3d at 314 (emphasis omitted); FED. R. CRIM. P. 11(b)(3). The defendant's admissions are compared with the elements of the offense. *Marek*, 238 F.3d at 314-15. "[I]nferences may be 'fairly drawn' from the evidence adduced after the acceptance of a guilty plea but before or at

statutory maximum punishment, or (ii) an arithmetic error at sentencing, (b) to challenge the voluntariness of his plea of guilty or this waiver, and (c) to bring a claim of ineffective assistance of counsel.

sentencing." *United States v. Hildenbrand*, 527 F.3d 466, 475 (5th Cir.) (citing *United States v. Dyer*, 136 F.3d 417, 425 n.13 (5th Cir. 1998), *cert. denied*, 129 S. Ct. 437 (2008). As set forth above, when reviewing under a plain error standard, this court "may consult the whole record when considering the effect of any error on substantial rights." *Vonn*, 535 U.S. at 59.

To establish aggravated identity theft, the government must prove that Oliver (1) knowingly used (2) the means of identification of another person (3) without lawful authority (4) during and in relation to a mail fraud offense. *See* 18 U.S.C. § 1028A; *accord United States v. Stephens*, 571 F.3d 401, 404-05 (5th Cir. 2009) (citing *Flores-Figueroa v. United States*, ___ U.S. ___, 129 S. Ct. 1886, 1888 (2009)).

While nothing in the record explicitly states that Oliver knew his victims were real persons, the evidence was sufficient for the district court to draw that inference. *See Hildenbrand*, 527 F.3d at 475 (citing *Dyer*, 136 F.3d at 425 n.13). In the factual basis, Oliver admitted that he "used without lawful authority a means of identification of another person." In addition, he admitted that he "did knowingly use, without lawful authority, the means of identification of another person, that is, the name, social security account number, and date of birth of B.P." One can reasonably infer that the reference to "B.P." suggests that Oliver knew that the information he used belonged to a real person bearing the initials B.P. Moreover, Agent McReynolds testified at sentencing that Henson sent Oliver text messages containing personal and identifying information of identity theft victims. Further, the cardboard box that Oliver kept at Armstrong's apartment contained identification cards and employment applications with identifying information as well as a list of names and corresponding social security numbers that Henson initially obtained while in prison. Nothing in the record suggests that any of the identities were fabricated; to the contrary, everything points to the conclusion that Oliver knew that the identities he used

No. 09-10133

to effectuate the scheme belonged to actual individuals. Because it can be fairly inferred that Oliver knowingly and unlawfully possessed or used the means of identification of real persons, he fails to show that the district court plainly erred. *See Hildenbrand*, 527 F.3d at 475; *Marek*, 238 F.3d at 314-15.

III.    Conclusion

Consistent with the foregoing analysis, the district court did not err when it denied Oliver's motions to suppress and for reconsideration. In addition, Oliver entered into the appeal waiver and plea agreement knowingly and voluntarily. Finally, there exists sufficient evidence supporting Oliver's aggravated identity theft conviction.

AFFIRMED.

No. 09-10133

EMILIO M. GARZA, Circuit Judge, dissenting.

I agree with most of the majority's opinion. I must dissent, however, from Part II.A.1, in which the majority states that the warrantless search of the cardboard box was permissible under the private search doctrine. Our case law indicates that the private search doctrine is a more narrow exception than what the majority holds. Although I dissent on this issue, I have reservations whether the cardboard box should be excluded from trial. This case cries out for an exception to exclusionary rule so that police errors of this type do not serve as an absolute bar. A brief recitation of the facts is necessary to fully explain my conclusion.

Prior to Oliver's arrest, his co-conspirator, Henson, had confessed to officers about evidence used in the crime. Specifically, Henson discussed a laptop computer and a box of documents that Oliver had moved into Armstrong's apartment. Henson did not know Armstrong's address, but he gave officers directions to her home along with an accurate description of her apartment building. When agents arrested Oliver near his home they returned to Oliver's house, with his consent, and questioned him. Oliver confessed and gave a detailed explanation of the scheme. Oliver admitted to using a laptop, but told agents he had tossed the computer into a lake. A few days later, the agents went to Armstrong's apartment and interviewed her. Unbeknownst to the agents, Armstrong had previously inspected the contents of Oliver's cardboard box and she had attempted to access the laptop's files.

Armstrong never informed the agents about her search. Instead, when agents inquired whether Oliver had left behind belongings, Armstrong pointed to a cardboard box in her dining room. She told the agents they could have it and the agents picked it up. Armstrong then led the agents to a bedroom where a laptop sat. Armstrong handed the laptop to the agents. Later, the agents obtained a search warrant so they could review the laptop's files. They did not

27

obtain a search warrant for the cardboard box because the agents thought they needed "a search warrant for a computer, not for a box of records."

The majority holds that this search was valid under the private search doctrine. In the majority's view, when a private individual examines a closed container's contents, a subsequent warrantless search by government officials does not violate the Fourth Amendment if the two searches are congruent in scope. Under this analysis, no consideration is given to an officer's knowledge of the private individual's earlier search. This interpretation, however, is much broader than the limits reached by our case law. We have held that in cases where police view evidence after a private citizen notifies officers about his search, the police's acts "'do not constitute a 'search' within the meaning of the Fourth Amendment so long as the view is confined to the scope and product of the initial search.'" *Runyan*, 275 F.3d at 458 (quoting *United States v. Bomengo*, 580 F.2d 173, 175 (5th Cir. 1978)). But, we have never applied this holding to a case in which a private citizen searches a closed container but fails to share his knowledge with police.

The requirement of a private individual sharing information with police is supported by the Court's holding in *Jacobsen*. 466 U.S. at 120 n. 17. In that case, Justice Stevens stated that the defendant's reasonable expectation of privacy had evaporated because "the Federal Express employees who were lawfully in possession of the package invited the agent to examine its contents; the governmental conduct was made possible only because private parties had compromised the integrity of this container." *Id*. Key to Justice Stevens's consideration was the sequence of events: a private search followed by an individual's disclosure of information to police. *Id*. at 119–20. Thus, under *Jacobsen,* the private search doctrine applies only when a private search is followed by an individual's disclosures to police about that search. *Id*.; *see also* 1 Wayne R. LaFave, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH

AMENDMENT §1.8 (4th ed. 2004). *Runyan* offers further support for this interpretation. In that case, we stated that "*Jacobsen* directs courts to inquire whether the government learned something from the police search that it could not have learned from the private searcher's *testimony* and if so, whether the defendant had a legitimate expectation of privacy in that *information*." 275 F.3d at 461 (citing *Jacobsen*, 466 U.S. at 118–20) (emphasis added). In *Runyan*, we emphasized throughout that we must consider whether the government had "knowledge" of a container's contents based on the citizen's statements, recollections, or description before we could answer whether the government's search exceeded a private search's scope. 275 F.3d at 463–64.

The majority relies on *Runyan* and *Jacobsen* to conclude that once an individual searches a defendant's closed container, "his reasonable expectation of privacy evaporates." In my reading of those cases, that is an incomplete representation of the holdings.[1] *Runyan* and *Jacobsen* weighed whether police exceeded the scope of a private search when citizens had explicitly informed officers about an earlier search. Neither case can truly be used to support the majority's view of the private search doctrine in this case. In a footnote, the majority responds that our prior private search doctrine cases have not expressly

---

[1] This interpretation is also contradicted by a number of other private search cases from this circuit in which we have upheld warrantless searches by the government. From these cases, a pattern emerges. First, a private citizen inspected an item for which there was a reasonable expectation of privacy. Then, the individual shared his knowledge with police. And, only then, did police conduct a constitutionally permissible warrantless search. This pattern indicates that the privacy right disappears only after the private citizen shares his knowledge with police. *See Bomengo,* 580 F.2d at 175–76 (apartment staff entered defendant's apartment, found guns in closet, and notified police who searched closet and seized guns); *United States v. Pierce*, 893 F.2d 669, 673-74 (5th Cir. 1990) (airline employees opened suspicious package and notified police about contents before officers searched package); *United States v. Grimes*, 244 F.3d 375, 383 (5th Cir. 2001) (computer repair technician viewed child pornography on defendant's computer and told police who viewed previously found images); *United States v. Parks*, 119 F. App'x 593, 598–99 (5th Cir. Dec. 2001) (unpublished) (upholding warrantless search under private search doctrine after Federal Express employees opened package, discovered drugs, and informed police).

required the sharing of information with police. This is inaccurate. In *Runyan*, we repeatedly stated that application of the private search doctrine depends on the police's "confirmation of prior knowledge" of a private citizen's search. 275 F.3d at 463. *Runyan* emphasized that the permissible scope of an officer's search turns on the officer's certainty of what was inside a closed container. That certainty can be established from "the statements of the private searchers, [officers'] replication of the private search, and [officers'] expertise." *Id*. *Runyan* specifically required a court to consider what knowledge private citizens shared with police. Here, agents could not confirm Armstrong's knowledge because they were unaware of her earlier search.

The majority also relies on our discussion in *Paige* about a defendant's reasonable expectation of privacy[2] to conclude that "it is the private search itself, and not the authorities' learning of such search, that renders a police officer's subsequent warrantless search permissible." *Paige*, however, involved the search of a defendant's garage by a private citizen, the results of which were immediately communicated to police before the government conducted a warrantless search. 136 F.3d at 1015–16. In *Paige*, our discussion specifically focused on foreseeability and an individual's expectation of privacy as it relates to the search of his home—a space that warrants special consideration under the Fourth Amendment. *Id*. at 1020–21. Based on this critical fact, we narrowly confined *Paige's* Fourth Amendment inquiry to "a police search of a home that extends no further than a previously-conducted private party search." *Id*. at

---

[2] Neither party has briefed whether Oliver had a reasonable expectation of privacy in the cardboard box he left at Armstrong's house. The district court assumed such an expectation existed. The majority concludes that Oliver's privacy right disappeared because he left the box at Armstrong's apartment "for several days without notifying or otherwise communicating his whereabouts to Armstrong." But, we do not know whether Oliver actually chose to leave the box unattended because agents located the box several days after they had arrested Oliver and placed him in federal custody.

1020. And, we specifically declined to extend *Jacobsen* or the private search doctrine to the facts of *Paige*. *Id*. at 1020 n.11.

Nonetheless, while I disagree with the majority's treatment of the private search doctrine, I have serious misgivings whether the contents of the cardboard box should be suppressed. Under our current precedent, we have little choice but to reflexively apply the exclusionary rule unless an exception exists. And, we are prevented from weighing whether the exclusion of evidence would truly deter future police misconduct.[3] I have serious doubts, however, whether that approach is correct.

Suppression of relevant, otherwise admissible evidence should always be "our last resort, not our first impulse." *Hudson v. Mich*., 547 U.S. 586, 591 (2006). Accordingly, the Supreme Court has long rejected the "reflexive application" of the exclusionary rule wherever a Fourth Amendment violation has occurred. *Ariz. v. Evans*, 514 U.S. 1, 13 (1995). The exclusionary rule is a prudential measure that applies "only where its deterrence benefits outweigh its 'substantial social costs.'" *Pa. Bd. of Prob. and Parole v. Scott*, 524 U.S. 357, 363 (1998) (quoting *United States v. Leon*, 468 U.S. 897, 907 (1984)). Although this case does not fall squarely within any of the established "exceptions" to the exclusionary rule, its peculiar facts present an instance where application of the rule seems particularly difficult to justify.

As the Court noted in *Herring v. United States*, the exclusionary rule applies only when it will result in the appreciable deterrence of deliberate, reckless, or grossly negligent police misconduct. 129 S. Ct. 695, 700, 702 (2009).

---

[3] *See Runyan*, 275 F.3d at 466 ("The exclusionary rule prohibits introduction at trial of evidence obtained as the result of an illegal search or seizure. The rule excludes not only the illegally obtained evidence itself, but also other incriminating evidence derived from that primary evidence. . . . [T]his court [has] outlined [ ] three primary exceptions to the exclusionary rule. Evidence will be admissible despite the exclusionary rule if: (1) it 'derives from an independent source,' (2) it 'has an attenuated link to the illegally secured evidence,' or (3) it 'inevitably would have been discovered during police investigation without the aid of the illegally obtained evidence.'") (internal citations omitted).

But police malfeasance does not exist here. When agents arrived at Armstrong's apartment they were not blindly searching for items that could link Oliver to the crime. Thanks to Henson's and Oliver's confessions, agents went to Armstrong's home with knowledge of what was inside the cardboard box—a notebook, credit and identification cards, and documents related to the fraud. When the agents thought they needed a search warrant for the laptop they obtained one immediately. When the agents failed to obtain a warrant to examine the box's contents—apparently because they misunderstood the law—they made a mistake that could have been avoided because they had probable cause to acquire a search warrant due to Henson's confession. The applicability of the exclusionary rule, however, does not depend on the wrongness of their judgment, but "the efficacy of the rule in deterring Fourth Amendment violations in the future." *Herring*, 129 S. Ct. at 700. Given that there is no evidence of malice here, as agents could have easily obtained a search warrant, I do not see how the interests of deterrence are served by excluding the cardboard box's contents.

Of course, law enforcement will always be better off obtaining a warrant in cases such as this. But suppression of evidence is not constitutionally commanded for failure to do so. *See Evans*, 514 U.S. at 10. Every application of the exclusionary rule exacts an extraordinary cost on "truth-seeking and law enforcement objectives." *Herring*, 129 S. Ct. at 701 (quoting *Scott*, 524 U.S. at 368). Before applying the rule, courts must consider whether "the benefits of deterrence . . . outweigh the costs." *Id.* (citing *Leon*, at 910). Here, the unconstitutional search resulted from an error in the agents' judgment, which in my view does not amount to misconduct. Although I disagree that the private search doctrine applies to this case, I would not apply the exclusionary rule to the facts of this case either. Unfortunately, I know of no case law or authority that would allow me to affirm the district court's judgment.

No. 09-10133

For the reasons stated above, I would REVERSE the district court's motion to suppress judgment and I would REMAND for further proceedings.[4]

---

[4] Under the terms of Oliver's conditional plea agreement, he is permitted to withdraw his guilty plea if he successfully appeals the denial of his suppression motion. The government, however, may prosecute any charges against him as to which the statute of limitations had not expired as of the filing of the indictment.